628 P.2d 897 (1981)
KENAI PENINSULA FISHERMAN'S COOPERATIVE ASSOCIATION, INC., Appellant,
v.
STATE of Alaska; The Board of Fisheries: Ronald Skoog, Commissioner of the Department of Fish and Game; and Ken Middleton, Regional Supervisor, Commercial Fishing Division of the Department of Fish and Game, Appellees.
No. 5072.
Supreme Court of Alaska.
May 22, 1981.
*898 Sandra K. Saville and Susan Vaillancourt, Kay, Christie, Fuld, Saville & Coffey, Anchorage, for appellant.
John A. Gissberg, Asst. Atty. Gen., Anchorage and Avrum M. Gross, Atty. Gen., Juneau, for appellees.
*899 Before RABINOWITZ, C.J., CONNOR, BURKE and MATTHEWS, JJ., and DIMOND, Senior Justice.

OPINION
DIMOND, Senior Justice.
This case arises on appeal from summary judgment granted in favor of the state. It concerns the validity of actions taken by the Board of Fisheries (hereafter Board) and the Commissioner of Fish and Game (hereafter Commissioner) affecting recreational and commercial fisheries of the salmon stocks in the Upper Cook Inlet.
Appellant, Kenai Peninsula Fisherman's Cooperative Association, Inc. (hereafter Association), is a group of commercial fishermen who harvest salmon in the Upper Subdistrict of the Central District of Cook Inlet. The Association challenges the adoption by the Board of a comprehensive management policy and a specific policy option which established priorities of use between commercial and recreational fishermen for certain salmon stocks in the Cook Inlet. The Association also claims that subsequent actions taken by the Board and the Commissioner which follow the assertedly illegal policy and option are invalid.
We hold that, while the Board does have the authority to establish priorities of use, the policy and option establishing these priorities should have been adopted pursuant to the provisions of the Administrative Procedure Act.

SUMMARY OF FACTS
In 1977, the Department of Fish and Game prepared a document entitled "Summary Report of Cook Inlet Salmon Stocks and Their Utilization," (hereafter report). The report addressed the growing problem of competition between commercial and recreational fishermen for the salmon stocks in Cook Inlet,[1] and requested long term direction from the Board on how to proceed with the management of various stocks in the Inlet.
All five species of salmon enter Cook Inlet, with considerable overlap in timing and migration routes.[2] While the commercial fishery harvests all five species, the report identified sockeye, chum and pink salmon as the three principal commercial species because of their total number, weight and value to the commercial fishery. The recreational fishery also harvests all five species, but the report indicated that sport demand centers on king and coho salmon.
The report discussed eleven different runs of the various salmon species which could to some degree meet the needs of the growing sports fishery. For certain runs which presented difficult management decisions, the report suggested several specific policy options for management of the stocks. The options generally provided for either maintenance of current management policies, curtailment of recreational fishing in favor of commercial fishing, or curtailment of commercial fishing in favor of recreational fishing.
The report was distributed to the members of the Board and the public at a September/October, 1977, hearing in Anchorage regarding Cook Inlet salmon. At a meeting in December, 1977, which had been called to consider proposed changes in fishing season regulations in the state, the Board also discussed long term management strategy for Upper Cook Inlet, salmon stocks, and adopted a Comprehensive Management Policy for the Upper Cook Inlet (hereafter policy). The policy established certain priorities of use between commercial and recreational fisheries based on the target species indicated for each group in the report. One consideration in adoption *900 of the policy was the need to inform user groups of the management plan for the stocks so that they could adjust their future uses consistent with that plan.[3]
In connection with the policy, the Board also adopted a Specific Policy Option (hereafter option) with respect to the late (after August 15) Kenai coho salmon run.[4] The option directed closure of the commercial fishery of this run if the commercial catch rates were below average. The purpose of this policy was to provide a satisfactory recreational fishery of the run, which had been identified in the policy as a primarily recreational species.
On September 2, 1978, the Commissioner declared an emergency closure of commercial fishing on the late Kenai coho stocks in order to comply with the Board's policy and management strategy governing these *901 stocks after August 15.[5] The order found that commercial catches of the late coho run from August 28 and September 1 were below average, and on that basis closed the commercial fishery.
In December, 1978, the Board adopted regulation 5 AAC 21.310 for the 1979 season. The regulation fixed June 25 as the opening date for commercial fishing in the Upper Subdistrict (and other subdistricts in the Central District), and August 15 as the closing date for set gill nets in the Upper Subdistrict and for drift gill nets within five miles of the eastern shore of the Upper and Lower Subdistricts. The effect of the regulation was to prevent members of the appellant association from harvesting the early king and red salmon runs, as well as the late Kenai coho run. In 1979, these runs were all open to recreational fishermen.
The Association's complaint against the state challenges, on several grounds, the validity of the policy, the option and the subsequent order and regulations adopted by the Board and the Commissioner. The Association moved for summary judgment based on stipulations of fact filed jointly by the Association and the state. The state opposed that motion and filed its own cross-motion for summary judgment, based on the joint stipulation of facts. The Association filed a statement of genuine issues of fact in opposition to the state's cross-motion; however, the state's cross-motion was granted by the trial court.
On appeal, the Association seeks reversal of the trial court decision and summary judgment in its favor because "as a matter of law [it] is entitled to a judgment invalidating the Comprehensive Management Policy and all ensuing regulations and mandates." We assume that the Association is not claiming the existence of genuine issues of fact, but merely that the trial court wrongly decided the validity of the policy, option and ensuing order and regulations as a matter of law.[6]

I.
We first consider the Association's contention that the general purposes of and the regulation-making powers delegated to the Board do not constitute sufficient authority to establish priorities among beneficial users of the fishery resources. Determination of the extent of the Board's authority requires examination of the statutes which created the Board of Fisheries and established its powers.
In 1975, a separate Board of Fisheries was established by the legislature "[f]or the purposes of the conservation and development of the fishery resources of the state." AS 16.05.221(a).[7] The legislature gave the Board certain regulation-making powers, but specifically excluded administrative, *902 budgeting and fiscal powers from the Board's function.[8] In AS 16.05.251(a), the Board is delegated the power to "make regulations it considers advisable in accordance with the Administrative Procedure Act (AS 44.62)" for certain enumerated areas of fisheries management.[9]
The Association maintains that these statutes do not delegate to the Board the power to determine "utilization" of fish resources, and therefore the Board cannot establish priorities of use. This claim is based primarily on the fact that, while article VIII, section 2,[10] of the Alaska Constitution gives the legislature authority to provide for utilization, development and conservation of all natural resources of the state, AS 16.05.221(a) establishes the Board for the purposes of conservation and development only. The Association argues that establishment of priorities among beneficial users comes exclusively within the ambit of "utilization," and that the legislature's failure to include "utilization" among the purposes for which the Board was created indicates that the legislature reserved this function to itself exclusively.
In support of this contention, the Association cites the passage by the legislature of the statute establishing subsistence use as the top priority use for all fish and game resources. Ch. 151, SLA 1978.[11] In the *903 statement of intent for that legislation, the legislature recognized the "need to develop a statewide policy on the utilization, development and conservation of fish and game resources." The Association argues that this enunciation of the entire trilogy of purposes from article VIII, section 2, to support action taken by the legislature "evidences that the legislature made a clear and intentional omission of `utilization' from the powers delegated" to the Board.
We find no merit in the Association's suggested interpretation of Board powers. As a general rule, conservation laws such as fish and game laws should be liberally construed to achieve their intended purpose. 3 C. Sands, Sutherland Statutory Construction § 71.14 at 365 (4th ed. 1974). Liberal construction of the statutes which establish the Board and delegate to it regulation-making powers leads to the conclusion that the Board has the power to make decisions affecting the utilization of fishery resources in this state.
The legislature established the Board for the purposes of conserving and developing fishery resources. The terms "conserving" and "developing" both embody concepts of utilization of resources. "Conserving" implies controlled utilization of a resource to prevent its exploitation, destruction or neglect. "Developing" connotes management of a resource to make it available for use.[12] If the Board is going to accomplish its designated purposes, it is necessarily going to make decisions concerning utilization of the resources it is charged with managing.
The legislature's statement in ch. 151, SLA 1978, does not indicate that it intended to reserve to itself the exclusive power to decide questions of utilization of fishery resources. That legislation created a statewide preference among beneficial users and affected all fish and game resources in the state. Such broad scale action is not evidence of an intent to deprive the Board of the ability to make the various other utilization decisions necessary to effectively conserve and develop the many fishery resources of the state.
Under this construction, the scope of Board action is not wholly without limitation. The Board must act under its specifically delegated regulatory powers, and actions taken must be premised on the need to effectuate conservation and development purposes. For example, in AS 16.05.251(a), the legislature delegated to the Board the power to "make regulations it considers advisable" for the twelve areas set out in the subsection. The quoted language indicates that the legislature intended to give the Board discretion to decide methods of regulation in these areas.[13] If, as is likely, the method of regulation affects the utilization of fishery resources by various user groups,[14] it will still be within the Board's powers as long as the regulation is based on the need to conserve and develop the affected fishery. An establishment of priorities of use which meets these criteria would be within the Board's delegated powers.
The Association also claims that article VIII, section 15,[15] prohibits an establishment *904 of priorities because that section precludes the creation of an exclusive right or special privilege of fishery.[16] Again, the Association's contention is without merit. While section 15 does prohibit granting monopoly fishing rights, that section was not meant to prohibit differential treatment of such diverse user groups as commercial, sports, and subsistence fishermen. To conclude that, because a certain species is made available for sport fishing in a given area, commercial fishing of the same species in the same area must also be allowed, would be to go far beyond the purpose of the section.[17]

II.
The Association next contends that the comprehensive management policy and the specific policy option adopted by the Board in December, 1977, are invalid because they were not adopted in accordance with the provisions for adoption of regulations set out in the Administrative Procedure Act, AS 44.62 (hereafter APA). The Board is required to follow APA procedures when adopting regulations pursuant to its statutorily delegated authority.[18] We have determined that an establishment of priorities of use may be adopted pursuant to a valid exercise of the Board's delegated regulatory powers. The state acknowledges that the policy and the option were not adopted according to APA procedures, but maintains that compliance was not necessary because they are not regulations; instead, they are merely general guidelines, adopted for the convenience of the public and other state agencies, to inform them of the Board's thinking on critical management issues in areas within its delegated authority.
AS 44.62.640(a)(2) defines "regulation" in part as:
every rule, regulation, order, or standard of general application or the amendment, supplement or revision of a rule, regulation, order or standard adopted by a state agency to implement, interpret, or make specific the law enforced or administered by it, or to govern its procedure, except one which relates only to the internal management of a state agency; .. . "regulation" includes "manuals," "policies," "instructions," "guides to enforcement," "interpretive bulletins," "interpretations," and the like, which have the effect of rules, orders, regulations or standards of general application, and this and similar phraseology shall not be used to avoid or circumvent this chapter; whether a regulation, regardless of name, is covered by this chapter depends in part on whether it affects the public or is used by the agency in dealing with the public. [Emphasis added.]
The Alaska APA is modeled after the California Administrative Procedure Act, Cal.Gov.Code § 11370 et seq., and the Model State Administrative Procedure Act. House Journal 1959 at 397. However, the Alaska APA goes beyond the definition of regulation contained in either of these statutes[19] by stating, "`[R]egulation' includes *905 `manuals,' `policies,' `instructions,' `guides to enforcement,'... ." One commentator has found the Alaska definition noteworthy "[i]n view of the tendency of many administrative officers to avoid compliance with the rulemaking requirements of the applicable statutes by utilizing a name other than `rule' or `regulation' to describe agency statements which have the effect of rules." 1 F. Cooper, State Administrative Law 115 (1965).
Clearly, then, the label placed on a particular statement by an administrative agency does not determine the applicability of the APA. Under the Alaska statute, "regulation" encompasses many statements made by administrative agencies, including policies and guides to enforcement. However, the state maintains that the policy and the option do not have the effect of rules, orders, regulations or standards of general application, and therefore are not covered by the statute. We disagree.
Under AS 44.62.640(a)(2), an indicia of a regulation is that it implements, interprets or makes specific the law enforced or administered by the state agency. As previously discussed, the Board is charged with management of the fishery resources of this state for conservation and development purposes. The policy and the option make specific the management policies of the Board for the Upper Cook Inlet fishery resources.
The wording of the policy suggests that it was intended to regulate future management of the salmon stocks in the Upper Cook Inlet. In the policy, the Board states that it "establishes priorities" of use for certain stocks, not that it intends to establish priorities in future regulations. The priorities established in the policy are based on the targeting of certain species as primarily commercial or primarily recreational. This classification of fish was undertaken without notice to commercial or recreational fishermen, who are obviously affected by the action. Furthermore, the policy directs that, on the basis of these established priorities, certain stocks "shall be managed" primarily as either noncommercial or nonrecreational resources. The mandatory language here is indicative of an intent to have the policy establish a course for future Board and Commissioner conduct affecting fishery rights in the Upper Cook Inlet.[20]
Another indicia of a regulation is that it "affects the public or is used by the agency in dealing with the public." Actions taken by the Board and the Commissioner demonstrate that the policy and the option served as a basis for decisions affecting commercial and recreational fishermen and were used by the Board in dealing with these groups.
The clearest instance of the policy and the option directly affecting commercial and recreational fishermen is the September, 1978, emgergency closure of the late Kenai coho run to commercial fishermen. On August 11, 1978, the Commissioner announced that, because of the Board's policy and specific option concerning the late Kanai coho run, the Department of Fish and Game would use the catches from three commercial fishing periods in mid and late August to determine the strength of the run. If the catches were below average, that commercial fishery would be closed pursuant to the direction of the policy and the option. The emergency order, issued *906 September 2, 1978, stated that because commercial catches were below average "commercial fishing on the late run Kenai River coho salmon stocks must be curtailed to comply with the Board of Fisheries' policy and management strategy governing these stocks after August 15." (Emphasis added.)
The staff of the Department of Fish and Game also used the policy as a guideline for proposing regulations setting opening and closing dates for the 1979 commercial season in the Upper Cook Inlet. The regulation adopted established opening and closing dates which were consistent with the priorities of use set out in the policy. In connection with the adoption of this regulation, the Board rejected a proposal from an area advisory committee which would have opened commercial fishing before July 1 in the Upper Subdistrict, and cited the policy as a reason for its action. In response to a letter to the governor criticizing the August 15 closure in the 1979 regulation, the governor wrote, "It is my understanding that the allocation to the sport fishery [of the salmon runs after August 15] is in keeping with the Upper Cook Inlet comprehensive management policy adopted by the Board in 1977. The policy has established long term direction for management of Cook Inlet salmon stocks... ."
We conclude that the policy and the option make specific management policies for Upper Cook Inlet salmon stocks, and have the effect of regulations or standards of general application for the management of those stocks. As such, they are regulations, and should have been adopted according to APA procedures. The state acknowledges that the policy and the option were not adopted according to APA procedures;[21] therefore, they are invalid. Coghill v. Boucher, 511 P.2d 1297, 1304-05 (Alaska 1973). There can be no future reliance on this particular policy or option either in the regulation-making process or as a basis for emergency orders until the procedures required by the APA are observed.

III.
The Association also raises several issues concerning the validity of subsequently adopted regulations and the emergency order.

A.
The Association contends that the invalidity of the policy also renders the 1978, 1979, and future regulations invalid. In response, the state argues that the invalidity of the policy should have no effect on regulations establishing fishing seasons because these regulations are adopted according to APA procedures. The state reasons that the regulations stand independent of the policy and, though a review of the factual bases for the regulation may reveal many of the same concerns expressed in the policy, this duplication should not invalidate the regulations. We do not have sufficient information in the record to determine the validity of the regulations. However, we will briefly review the process for deciding this question.
Our review of regulations adopted by an agency in its quasi-legislative capacity is set out in Kelly v. Zamarello, 486 P.2d 906 (Alaska 1971). If adopted according to APA procedures and within the discretion vested in the Board by the legislature, our review is limited to (1) whether the regulation is consistent with the statute (i.e., within the scope of the Board's authority) and reasonably necessary to its purposes, and (2) whether the regulation is reasonable and not arbitrary. Id. at 911. The record indicates that the policy served as a guide for the regulation proposed and adopted in *907 1979. Because the policy was invalidly adopted, it was improperly relied upon. If, however, the regulations adopted were reasonable and not arbitrary, based on the total information before the Board at the time each was adopted and excluding the management priorities established in the policy, the invalidity of the policy would not affect the validity of the fishing season regulations.

B.
Although the emergency order has long since expired, the Association asserts that the question of its validity is not moot because of "the prospect that the power may similarly be misused [by the Commissioner] in the future." It is the Association's contention that the Commissioner has misinterpreted the scope of the power conferred on him by AS 16.05.060.[22]
The Association first claims that the Commissioner cannot order emergency openings or closures for the purpose of implementing a management plan or policy, but can only make such an order on the basis of a biological emergency endangering current fish stocks. AS 16.05.060 authorizes the Commissioner "when circumstances require, to summarily open or close seasons or areas ... by means of emergency orders." AS 16.05.060 does not provide a guide as to what the "circumstances" are which might necessitate an emergency order. It is the Association's contention that "circumstances" can only mean biological emergencies.
We disagree. Where a statute delegating authority to an administrative agency does not expressly provide a standard, the standard may be implied from the general policy and purposes underlying the legislative enactment. Turner v. Board of Trustees, Calexico Unified School District, 16 Cal.3d 818, 129 Cal. Rptr. 443, 548 P.2d 1115, 1120 (1976). The extent of the Commissioner's power under AS 16.05.060 should therefore be interpreted in light of the overall purpose of the constitutional and legislative scheme of management of state resources prescribed by other provisions of the law. Thus, if the Board properly adopted a plan for the management of state fishery resources, the Commissioner could enforce that policy through the emergency order process. The 1978 emergency order was invalid because it was premised on compliance with the invalidly adopted policy and option.[23] However, future emergency closures which are ordered to implement properly adopted management policies would be valid.
The Association next contends that the method used by the Commissioner to implement the 1978 emergency closure was outside the scope of his authority. In the emergency order, the Commissioner sought to close commercial fishing of the late Kenai coho run in the Upper Cook Inlet. He did this by amending the 1978 gear regulations for set gill nets and drift gill nets in the central district because these were the gear types commercially harvesting this run in the Upper Cook Inlet. The Association claims that the Commissioner's power under AS 16.05.060 is limited to ordering closure of a season or an area, but does not extend to amending gear regulations so as to close a season or an area to one gear type but not to others.
We have already concluded that the Board may validly adopt a management policy which establishes priorities of use, and that the Commissioner may use the emergency order process to implement a properly adopted management policy. The Commissioner may therefore use the emergency order process to close down one type of fishery and not another in order to implement a policy establishing priorities of use.
*908 The effect of the gear regulation amendment was to close the commercial fishing season for the Kenai coho run in the area of the Upper Cook Inlet where this species was commercially fished. Because closure by season or by area was within the Commissioner's powers, and the amendment of the gear regulation had that effect, we conclude that the method of implementing the emergency closure was not outside the Commissioner's delegated authority.

IV.
The trial court found that the policy adopted by the Board did not violate the Association's constitutional rights of equal protection and due process, nor did it violate the provisions of article VIII of the Alaska Constitution. Because we find that the policy was not adopted according to proper APA procedures, we do not feel it is proper to reach the constitutional validity of the actual policy adopted. The purpose of the notice and hearing provisions of the APA is two-fold. First, it gives notice to interested parties of proposed agency actions which may affect their interests. Next, it gives the administrative agency the opportunity to receive information and comments from those interested parties on its proposed action.[24] Both the Board and interested fishermen should have full benefit of these opportunities before a review is made of the validity of the policy adopted.
The decision of the superior court that the Comprehensive Management Policy need not be adopted according to APA procedures is REVERSED.
COMPTON, J., not participating.
NOTES
[1] According to the report, competition for stocks in Cook Inlet is probably worse than in other parts of the state. While the natural salmon runs in the Inlet are about five per cent of the statewide production capability, commercial fishermen holding entry permits make up about fourteen per cent of the statewide salmon net fishery, and nearly half of all recreational anglers in the state fish the Inlet and adjacent streams.
[2] The five species of salmon are sockeye (red), chum, pink, king and coho (silver).
[3] The policy reads as follows:

COMPREHENSIVE MANAGEMENT POLICY FOR THE UPPER COOK INLET
The dramatically increasing population of the Cook Inlet area has resulted in increasing competition between recreational and commercial fishermen for the Cook Inlet salmon stocks. Concurrently, urbanization and associated road construction has increased recreational angler effort and may adversely affect fisheries habitat. As a result the Board of Fisheries has determined that a policy must now be determined for the long-term management of the Cook Inlet salmon stocks. This policy should rest upon the following considerations:
1. The ultimate management goal for the Cook Inlet stocks must be their protection and, where feasible, rehabilitation and enhancement. To achieve this biological goal, priorities must be set among beneficial uses of the resource.
2. The commercial fishing industry in Cook Inlet is a valuable long-term asset of this state and must be protected, while recognizing the legitimate claims of the noncommercial user.
3. Of the salmon stocks in Cook Inlet, the king and silver salmon are the target species for recreational anglers while the chum, pink, and red salmon are the predominant commercial fishery.
4. User groups should know what the management plan for salmon stocks will be in order that they can plan their use consistent with the plan. Thus, commercial fishermen must know if they are harvesting stocks which in the long-term will be managed primarily for recreational consumption so that they may plan appropriately. Conversely, as recreational demands increase the recreational user must be aware of what stocks will be managed primarily for commercial harvest in order that he not become overly dependent on these fish for recreational purposes.
5. Various agencies should be aware of the long-term management plan so that salmon management needs will be considered when making decisions in areas such as land use planning and highway construction.
6. It is imperative that the Department of Fish and Game receive long-range direction in management of these stocks rather than being called upon to respond to annually changing Board directives. Within the Department, divisions such as F.R.E.D., must receive such long-term direction.
Therefore, the Board establishes priorities on the following Cook Inlet stocks north of Anchor Point. In so doing it is not the Board's intent to establish exclusive uses of salmon stocks; rather its purpose is to define the primary beneficial use of the stock while permitting secondary uses of the stock to the extent it is consistent with the requirements of the primary user group.
1. Stocks which normally move in the Cook Inlet to spawning areas prior to June 30, shall be managed primarily as a non-commercial resource.
2. Stocks which normally move in Cook Inlet after June 30, shall be managed primarily as a non-recreational resource until August 15; however existing recreational target fish shall only be harvested incidental to the nonrecreational use; thereafter stocks moving to spawning areas on the Kenai Peninsula shall be managed primarily as a non-commercial resource. Other stocks shall continue to be managed primarily as a non-recreational resource.
3. The Susitna coho, the Kenai king, and the Kenai coho runs cannot be separated from other stocks which are being managed primarily as non-recreational resources; however, efforts shall be made, consistent with the primary management goal, to minimize the non-recreational catch of these stocks.
[4] The Specific Policy Option provided:

Option B  Curtail commercial fishery catch level to attempt to provide a satisfactory recreational fishery:
1. Adopt a policy that, if the commercial catch rates indicate a below average run, the commercial fishery would close. If the commercial fishery catch rates are at or above average, the maximum commercial fishing time would be two 12-hour periods.
[5] Regulations, which are reconsidered yearly by the Board, set the opening and sometimes the closing dates for the commercial and recreational fisheries. Prior to 1979, regulations for this area of Cook Inlet usually provided for closure by emergency order of the Commissioner.

Authorization for emergency closure comes from AS 16.05.060, which provides:
This chapter does not limit the power of the commissioner or his authorized designee, when circumstances require, to summarily open or close seasons or areas or to change weekly closed periods on fish or game by means of emergency orders. An emergency order has the force and effect of law after field announcement by the commissioner or his authorized designee. An emergency order adopted under this section is not subject to the Administrative Procedure Act (AS 44.62).
[6] Civil Rule 56(c) provides that a grant of summary judgment is proper when there is no genuine issue of fact to be determined by the trier of fact, and the movant is entitled to judgment on law applicable to the established facts. Moore v. State, 553 P.2d 8, 15 (Alaska 1976).
[7] AS 16.05.221(a) provides in part:

(a) For purposes of the conservation and development of the fishery resources of the state, there is created the Board of Fisheries composed of seven members appointed by the governor, subject to confirmation by a majority of the members of the legislature in joint session.
Prior to 1975, AS 16.05.221 provided for one Board of Fish and Game.
[8] AS 16.05.241 provides:

The boards have regulation-making powers as set out in this chapter, but do not have administrative, budgeting or fiscal powers.
The regulation-making powers set out in the chapter include: (1) AS 16.05.251(a), set out in note 9 infra; (2) AS 16.05.251(b), relating to subsistence use as a priority use; and (3) AS 16.05.260, TEXT] relating to establishment of advisory committees.
[9] AS 16.05.251 provides in part:

(a) The Board of Fisheries may make regulations it considers advisable in accordance with the Administrative Procedure Act (AS 44.62) for
(1) setting apart fish reserve areas, refuges and sanctuaries in the waters of the state over which it has jurisdiction, subject to the approval of the legislature;
(2) establishment of open and closed seasons and areas for the taking of fish;
(3) setting quotas and bag limits on the taking of fish;
(4) establishment of the means and methods employed in the pursuit, capture and transport of fish;
(5) establishment of marking and identification requirements for means used in pursuit, capture and transport of fish;
(6) classifying as commercial fish, sport fish or predators or other categories essential for regulatory purposes;
(7) engaging in biological research, watershed and habitat improvement, fish management, protection, propagation and stocking;
(8) investigating and determining the extent and effect of disease, predation, and competition among fish in the state, exercising control measures considered necessary to the resources of the state;
(9) entering into cooperative agreements with educational institutions and state, federal, or other agencies to promote fish research, management, education and information and to train men for fish management;
(10) prohibiting and regulating the live capture, possession, transport, or release of native or exotic fish or their eggs;
(11) establishing seasons, areas, quotas and methods of harvest for aquatic plants;
(12) establishment of the times and dates during which the issuance of fishing licenses, permits and registrations and the transfer of permits and registrations between registration areas is allowed; however, this paragraph does not apply to permits issued or transferred under ch. 43 of this title.
[10] Article VIII, section 2, of the Alaska Constitution provides:

The legislature shall provide for the utilization, development, and conservation of all natural resources belonging to the State, including land and waters, for the maximum benefit of its people.
[11] Chapter 151, SLA 1978, provides in part:

Section 1. INTENT. The legislature finds that there is a need to develop a statewide policy on the utilization, development and conservation of fish and game resources, and to recognize that these resources are not inexhaustible and that preferences must be established among beneficial users of the resources. The legislature further determines that it is in the public interest to clearly establish subsistence use as a priority use of Alaska's fish and game resources and to recognize the needs, customs and traditions of Alaska residents. The legislature further finds that beneficial use of those resources by all state residents should be carefully monitored and regulated, with as much input as possible from the affected users, so that the viability of fish and game resources is not threatened and so that resources are conserved in a manner consistent with the sustained-yield principle.
[12] See Webster's New Collegiate Dictionary (1973), which defines "conservation" as "planned management of a natural resource to prevent exploitation, destruction, or neglect"; and defines "develop" as "to make available or usable."
[13] A grant of broad discretion to an administrative agency may be advisable where the agency functions in an area "where social or economic controls of private activity are deemed desirable, but where the legislature despairs of formulating a general rule which will be capable of precise and equitable application to all the contingencies that are anticipated." 1 F. Cooper, State Administrative Law 35 (1965).
[14] Many of the specific areas of regulation set out in AS 16.05.251(a) inevitably will involve regulation of the use of the fishery resources. For example, the Board cannot make regulations establishing open and closed seasons, set quotas, classify fish, or make fish management decisions without somehow directing the use of the fishery resources.
[15] Article VIII, section 15, states:

No exclusive right or special privilege of fishery shall be created or authorized in the natural waters of the State. This section does not restrict the power of the State to limit entry into any fishery for purposes of resource conservation, to prevent economic distress among fishermen and those dependent upon them for a livelihood and to promote the efficient development of aquaculture in the State.
[16] The Association has raised a number of constitutional arguments concerning the Board's actions. Because we hold that the policy is invalid on the ground that it was not adopted according to proper APA procedures, infra, we need not consider the equal protection, due process, and other issues raised regarding the validity of the actual policy adopted. We will, however, consider the constitutional issue raised concerning the general validity of establishment of priorities of use as a means of resource management.
[17] See Hynes v. Grimes Packing Co., 165 F.2d 323, 326 (9th Cir.1947), vacated and remanded, 337 U.S. 86, 69 S.Ct. 968, 93 L.Ed. 1231 (1949); Metlakatla Indian Community v. Egan, 362 P.2d 901 (Alaska 1961), vacated and remanded, 369 U.S. 45, 82 S.Ct. 552, 7 L.Ed.2d 562 (1962).
[18] See AS 16.05.251(a) and (b); AS 16.05.260.
[19] (See Cal.Gov.Code § 11342 (Deering's Supp. 1980) (former Gov.Code § 11371); Model State Administrative Procedure Act § 1 Revised 1961).

The California APA has been commented on as demonstrating "a desire to achieve ... a much greater coverage of rules than Congress sought in the federal APA." Armistead v. State Personnel Bd., 22 Cal.3d 198, 149 Cal. Rptr. 1, 583 P.2d 744, 745 (1978) (footnote omitted). The federal act creates specific exceptions from notice and hearing requirements for interpretive rules and general statements of policy. 5 U.S.C. § 553(b)(A).
[20] See People v. Cull, 10 N.Y.2d 123, 218 N.Y.S.2d 38, 176 N.E.2d 495 (N.Y.App. 1961), wherein the New York court held that the term "rule" or "regulation" encompassed "any kind of legislative or quasi-legislative norm or procedure which establishes a pattern or course of conduct for the future." Id. 10 N.Y.2d 123, 218 N.Y.S.2d 38, 176 N.E.2d at 497 (emphasis added). In that case, the New York Constitution required that, in order to be effective, all rules and regulations had to be filed with the appropriate department of the state. The court concluded that an order setting a maximum speed limit, which was made by the state traffic commissioner, was a rule or regulation subject to the constitutional provision.
[21] The state contends in its brief that all the Board would have to do to comply with the APA would be to complete the appropriate filing procedures under AS 44.62.040-.125. This contention seems to be based on the fact that the notice for the December, 1977, meeting specified that at the meeting fishing season dates would be set. AS 44.62.200 requires that the notice of a proposed adoption of a regulation must include "an informative summary of the proposed subject of agency action. The notice of the December, 1977, meeting made no mention of planned adoption of a long-term management policy for the area. Therefore, it was insufficient notice of the Board's adoption of the comprehensive management policy.
[22] See note 5 supra for text of AS 16.05.060.
[23] The emergency order was issued only after it was determined that commercial catch rates were below average. Thus, there was arguably an alternative independent rationale for ordering closure separate from the policy and the option. However, both the news release and the order itself indicate that it was issued specifically to comply with the policy and the option.
[24] See Cheshire Convalescent Ctr. v. Comm'n on Hospitals, 34 Conn.Sup. 225, 386 A.2d 264, 271 (1977); Bassett v. State Fish & Wildlife Comm'n, 27 Or. App. 639, 556 P.2d 1382, 1384 (1976).