Gene MADISON, Lucy Casey, Ken McGahan, Sr., Andy Johnson, Margie Kivi, J.W. Ware, Dick Francis, Don Groleske, Ken Jordon and Shirley Devault, Appellants,

v.

ALASKA DEPARTMENT OF FISH AND GAME, and Alaska Board of Fisheries, Appellees,

and

The Alaska Federation of Natives, Intervenor.

ALASKA DEPARTMENT OF FISH AND GAME, Ronald Skoog, Alaska Board of Fisheries, Appellants,

v.

Louis GJOSUND, Dora Mulch, and Kachemak Bay Subsistency Group, Inc., Cross-Appellees.

Nos. 6824/7181, 7410.

Supreme Court of Alaska.

Feb. 22, 1985.

---

Martin Friedman, Homer, Arthur Robinson, Soldotna, for appellants/cross-appellees.

Larri Irene Spengler, Asst. Atty. Gen., Norman C. Gorsuch, Atty. Gen., Juneau, for appellees/appellants.

Donald C. Mitchell, Anchorage, for intervenor/amicus curiae.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

MOORE, Justice.

This case arises as a consolidated appeal of two cases. It concerns the validity of a Board of Fisheries' (hereafter board) regulation designed to identify eligibility for

subsistence fishing in the Cook Inlet region.

Appellants (hereafter Madison and Gjosund) are two groups of Alaskan residents who live along the Kenai coastline and near Homer. For many years, they have fished with set nets for salmon for their personal and family use. Nonetheless, the board denied subsistence permits to Madison and Gjosund because their use of salmon did not meet the board's regulatory definition of subsistence. Both Madison and Gjosund challenged the regulation as exceeding the scope of the state's subsistence law. In both cases, the trial courts upheld the regulation as consistent with the statutory grant of authority. We hold the regulation invalid since it is inconsistent with AS 16.-05.251(b), AS 16.05.940(22) and AS 16.05.-940(23) and contrary to the legislature's intent in enacting the 1978 subsistence law.

## I. SUMMARY OF FACTS

Records indicate that subsistence fishing in Cook Inlet was minimal through the mid-1970s.[1] However, a core group of residents of each Cook Inlet community has traditionally fished for Cook Inlet salmon for subsistence. Participation in the subsistence salmon fishery is most visible in the smaller, more isolated villages, where the subsistence group represents a larger percentage of the population.

In 1977 the board established a comprehensive management policy for Cook Inlet, 5 AAC 21.363, which essentially allocated specific salmon stocks to sports fishermen and commercial fishermen on the basis of seasonal fish movements. *See Kenai Peninsula Fisherman's Cooperative Ass'n v. State*, 628 P.2d 897 (Alaska 1981). Although the policy did not specifically refer to subsistence uses of salmon in Cook Inlet, it had a substantial impact on subsistence fishing. Commercial fishermen, accustomed to taking subsistence salmon from their commercial catch, instead obtained subsistence salmon fishing permits in order to fish for their personal and family use after the commercial season was over.

Before 1978, subsistence fishing was defined in AS 16.05.940(17) as fishing for "personal use and not for sale or barter."[2] In 1978, the Alaska State Legislature enacted ch. 151 SLA 1978 (hereafter the 1978 subsistence law). Subsistence fishing was redefined as fishing for "subsistence uses."[3] Subsistence uses were defined as "customary and traditional uses ... for direct personal or family consumption, and for the customary trade, barter or sharing...." AS 16.05.940(23).[4] Furthermore, the legislation required the board to adopt regulations permitting "subsistence uses" of fish stocks, absent a showing that this use would jeopardize the sustained yield

---

1. From 1971 to 1977, the average number of subsistence permits issued annually for the Upper Cook Inlet was 87 and the average catch was 405 salmon. Commercial harvest averaged about two million fish per year. However, this statistical data does not necessarily reveal the total subsistence use since many people did not obtain permits and some commercially caught salmon were used for subsistence.

2. Section 4, ch. 131 SLA 1960:
   "subsistence fishing": the taking, fishing for or possession of fish, shellfish, or other fishery resources for personal use and not for sale or barter, with gill net, seine, fish wheel, long line, or other means as defined by the Board.

3. AS 16.05.940(22), (formerly AS 16.05.940(17)), states:
   "subsistence fishing" means the taking, fishing for, or possession of fish, shellfish, or other fisheries resources for subsistence uses with

gill net, seine, fish wheel, long line, or other means defined by the Board of Fisheries.

4. AS 16.05.940(23), (formerly AS 16.05.940(26)), states:
   "subsistence uses" means the customary and traditional uses in Alaska of wild, renewable resources for direct personal or family consumption as food, shelter, fuel, clothing, tools, or transportation, for the making and selling of handicraft articles out of nonedible byproducts of fish and wildlife resources taken for personal or family consumption, and for the customary trade, barter or sharing for personal or family consumption; for the purposes of this paragraph, "family" means all persons related by blood, marriage, or adoption, and any person living within the household on a permanent basis.

principle. AS 16.05.251(b).[5] Under AS 16.-05.251(b), subsistence uses have priority over sport and commercial uses if the board finds it necessary to restrict the taking of fish to assure the maintenance of fish stocks or to assure the continuation of subsistence uses. If further restrictions are necessary after giving priority to all subsistence uses, the legislature established specific criteria to restrict subsistence uses based on the subsistence user's customary and direct dependence on the resource, local residency and availability of alternative resources. *Id.* As a result, the board could no longer allocate for subsist-ence uses at its discretion pursuant to AS 16.05.251(a).[6] The legislature mandated in AS 16.05.251(b) that the board regulate for the protection of subsistence uses as the priority use of fish and game.

The passage of the 1978 subsistence law, combined with adoption of the board's 1977 management policy, heightened public awareness of the state's subsistence fishing provisions. This public interest resulted in a substantial increase in the demand for subsistence permits and a corresponding increase in total catch.[7] The board responded to the permit increase by restricting subsistence fishing; it limited ar-

5. AS 16.05.251(b) states:

The Board of Fisheries shall adopt regulations in accordance with the Administrative Procedure Act (AS 44.62) permitting the taking of fish for subsistence uses unless the board determines, in accordance with the Administrative Procedure Act, that adoption of the regulations will jeopardize or interfere with the maintenance of fish stocks on a sustained-yield basis. Whenever it is necessary to restrict the taking of fish to assure the maintenance of fish stocks on a sustained-yield basis, or to assure the continuation of subsistence uses of such resources, subsistence use shall be the priority use. If further restriction is necessary, the board shall establish restrictions and limitations on and priorities for these consumptive uses on the basis of the following criteria:

(1) customary and direct dependence upon the resource as the mainstay of one's livelihood;

(2) local residency; and

(3) availability of alternative resources.

6. AS 16.05.251(a) states:

The Board of Fisheries may adopt regulations it considers advisable in accordance with the Administrative Procedures Act (AS 44.62) for

(1) setting apart fish reserve areas, refuges and sanctuaries in the waters of the state over which it has jurisdiction, subject to the approval of the legislature;

(2) establishing open and closed seasons and areas for the taking of fish;

(3) setting quotas and bag limits on the taking of fish;

(4) establishing the means and methods employed in the pursuit, capture and transport of fish;

(5) establishing marking and identification requirements for means used in pursuit, capture and transport of fish;

(6) classifying as commercial fish, sport fish or predators or other categories essential for regulatory purposes;

(7) engaging in biological research, watershed and habitat improvement, fish management, protection, propagation and stocking;

(8) investigating and determining the extent and effect of disease, predation, and competition among fish in the state, exercising control measures considered necessary to the resources of the state;

(9) entering into cooperative agreements with educational institutions and state, federal, or other agencies to promote fish research, management, education and information and to train persons for fish management;

(10) prohibiting and regulating the live capture, possession, transport, or release of native or exotic fish or their eggs;

(11) establishing seasons, areas, quotas and methods of harvest for aquatic plants;

(12) establishing the times and dates during which the issuance of fishing licenses, permits and registrations and the transfer of permits and registrations between registration areas is allowed; however, this paragraph does not apply to permits issued or transferred under AS 16.43.

7. This chart reflects the trend in Upper Cook Inlet:

| | Subsistence Use | | Commercial Harvest |
| --- | --- | --- | --- |
| | Permits Issued | Salmon Caught | |
| 1978 | 323 | 3,735 | 5,118,041 |
| 1979 | 1,161 | 9,923 | 1,923,229 |
| 1980 | 1,331 | 14,775 | 4,138,648 |

In 1980, household permits were issued instead of individual permits.

eas open to subsistence fishing, length of fishing periods and maximum length of gill nets. Several lawsuits were filed, all of which resulted in decisions unfavorable to the board.

In December 1980, the board held hearings to respond to the 1978 subsistence law and received a considerable amount of testimony on subsistence uses in Cook Inlet. The meeting resulted in the establishment of characteristics for identification of "customary and traditional uses" of Cook Inlet salmon.[8] In addition, the board decided to "adopt a set of criteria drawn from the characteristics ... and apply [them] to communities, subcommunities, groups and individuals who wish to continue to participate in an established customary and traditional fishing effort in Cook Inlet."

At its March 1981 meeting, the board received written testimony from the public about subsistence uses of Cook Inlet salmon stock. Subsequently, it decided to apply all of the ten criteria to determine "customary and traditional uses" eligible for the subsistence priority. When the board applied the ten criteria, it determined that no group or community in the Cook Inlet region other than Tyonek, English Bay and Port Graham satisfied all ten of the criteria. The board limited the 1981 subsistence catch to these three communities. As a result, the board eliminated from the protection of the state's subsistence statute the majority of Cook Inlet fishermen who formerly fished under subsistence regulations.

Madison and Gjosund challenged the validity of the board's subsistence criteria (now 5 AAC 01.597) on several grounds. They claimed that: (1) the criteria were inconsistent with the statutory language and legislative intent of the 1978 subsistence law; (2) the board failed to comply with the Administrative Procedure Act in adopting the criteria; and (3) their equal protection and due process rights were violated by the board's action.[9] Both courts

---

8. With some modification, these characteristics became the basis of 5 AAC 01.597, which states:

CHARACTERISTICS OF SUBSISTENCE FISHERIES.

(a) The Board of Fisheries finds that certain customary and traditional practices and procedures associated with the utilization of fish in the Cook Inlet Area can be used to identify subsistence uses. Based on testimony to the board, the following characteristics are those that should be evaluated in the identification of subsistence fisheries:

(1) a long-term, stable, reliable pattern of use and dependency, excluding interruption generated by outside circumstances, e.g., regulatory action or fluctuations in resource abundance;

(2) a use pattern established by an identified community, subcommunity or group having preponderant concentrations of persons showing past use;

(3) a use pattern associated with specific stocks and seasons;

(4) a use pattern based on the most efficient and productive gear and economical use of time, energy and money;

(5) a use pattern occurring in reasonable geographic proximity to the primary residence of the community, group or individual;

(6) a use pattern occurring in locations with easiest and most direct access to the resources;

(7) a use pattern which includes a history of traditional modes of handling, preparing and storing the product without precluding recent technological advances;

(8) a use pattern which includes the intergenerational transmission of activities and skills;

(9) a use pattern in which the effort and products are distributed on a community and family basis including trade, bartering, sharing and gift-giving; and

(10) a use pattern which includes reliance on subsistence taking of a range of wild resources in proximity to the community or primary residency.

(b) The board will identify established geographic communities which may be participating in a subsistence system. The board will then apply all of the characteristics in (a) of this section to the communities and to subcommunities, groups and individuals within the communities to determine which uses are customary and traditional and therefore, which communities are eligible for the subsistence priority.

(c) For purposes of this section, a "community" is generally considered to be several households of full-time residents who all reside in a specific geographic area because of common interests.

9. Since we hold the regulation invalid because it is inconsistent with AS 16.05.251(b) and AS 16.-05.940(22) and (23), and contrary to the legislature's intent in enacting the 1978 subsistence law, we need not consider the APA, due process

issued preliminary injunctions compelling the board to authorize personal use fishing for Madison and Gjosund similar to that allowed in the previous year. The board moved for summary judgment on the plaintiffs' first claim. Both trial courts granted summary judgment to the board, after finding the subsistence criteria consistent with the legislative intent "to provide for and protect personal use ... by persons who reside in rural communities...."

On appeal, Madison and Gjosund seek reversal of the two trial court decisions. They claim that the board did not act within the legislative authority granted by AS 16.05.251(b) and AS 16.05.940(22) and (23) when it adopted the ten characteristics ultimately codified as 5 AAC 01.597.[10]

## II. STANDARD OF REVIEW

We first consider the appropriate standard of review for this case. The legislature enacted AS 16.05.251(b), which requires the board to adopt regulations permitting the taking of fish for "subsistence uses." The legislature then defined subsistence uses as "customary and traditional" uses in AS 16.05.940(23), but it never defined "customary and traditional." The board developed the ten criteria (now codified as 5 AAC 01.597) to identify customary and traditional uses qualifying for a subsistence priority under AS 16.05.251(b). Therefore, the board interpreted the 1978 subsistence law and devised its regulatory criteria accordingly.

■ In *Kelly v. Zamarello*, 486 P.2d 906, 917 (Alaska 1971), we stated that the "reasonable basis approach should be used for the most part in cases concerning administrative expertise as to either complex subject matter or fundamental policy formulations." However, the issues in this case concern statutory interpretation of the words "customary and traditional" and the question whether the board has acted within the scope of its statutory authority. Such issues "fall into the realm of special competency of the courts." *Alaska Public Utility Commission v. Municipality of Anchorage*, 555 P.2d 262, 266 (Alaska 1976). *See also State, Commercial Fisheries Entry Commission v. Templeton*, 598 P.2d 77, 80 (Alaska 1979).

■ In this instance, we are dealing with a question of statutory interpretation and will apply the substitution of judgment standard.

The substitution of judgment standard is applied when the questions of law presented do not involve agency expertise, and, thus, a court need not take the deferential stance embodied in the rational basis test.... The standard is appropriate where the knowledge and experience of the agency is of little guidance to the court or where the case concerns *"statutory interpretation* or other analysis of legal relationships about which courts have specialized knowledge and experience."

*Earth Resources Co. v. State, Department of Revenue*, 665 P.2d 960, 965 (Alaska 1983), quoting *Kelly v. Zamarello*, 486 P.2d at 916 (emphasis added). Application of this standard allows the reviewing court to substitute its judgment about a statute's meaning for the board's interpretation, even if the board's interpretation had a reasonable basis in law. In this case, both trial courts erred by applying the reasonable basis standard to the board's statutory interpretation.

## III. LEGISLATIVE HISTORY OF THE 1978 SUBSISTENCE LAW

Before 1978, subsistence fishing was defined as fishing for "personal use and not for sale or barter." Formerly AS 16.05.-940(17). The 1978 subsistence law redefined subsistence fishing as fishing for

---

and equal protection issues raised regarding the regulation's validity.

**10.** Madison and Gjosund also contend that the board exceeded its statutory authority under AS 16.05.251(a) when it established a personal use

fishery to accommodate people excluded from the subsistence fishery by 5 AAC 01.597. Because we hold 5 AAC 01.597 invalid, we need not address the issue of the board's authority to establish a personal use fishery.

"subsistence uses." AS 16.05.940(22). "Subsistence uses" were defined as "the customary and traditional uses in Alaska of wild, renewable resources for direct personal or family consumption ... and for the customary trade, barter or sharing...." AS 16.05.940(23). The board argues that the legislature intended to narrow the scope of subsistence fishing to mean fishing by individuals residing in those rural communities that have historically depended on subsistence hunting and fishing. Under this interpretation, the board asserts that its criteria are consistent with the legislature's intent.

■ The board's argument reveals a fundamental misconception about the structure of the 1978 subsistence law. There are potentially two tiers of subsistence users under AS 16.05.251(b). The first tier includes *all* subsistence users. Under the statute, all subsistence uses have priority over sport and commercial uses "whenever it is necessary to restrict the taking of fish to assure the maintenance of fish stocks on a sustained-yield basis, or to assure the continuation of subsistence uses of such resources...." AS 16.05.251(b). If the statutory priority given all subsistence users over commercial and sport users still results in too few fish for all subsistence uses, then the board is authorized to establish a second tier of preferred subsistence users based on the legislative criteria expressed in AS 16.05.251(b), namely, customary and direct dependence on the resource, local residency, and availability of alternative resources.

■ Criteria like the ten criteria of 5 AAC 01.597(a) could be used to distinguish first-tier general subsistence users from second-tier preferred subsistence users, since most of the criteria relate to either "customary and direct dependence" or "local residency," two of the three criteria set out in AS 16.05.251(b). However, before there is any occasion to restrict subsistence fishing to second-tier preferred subsistence users as distinct from all subsistence users, the board must make two findings. It must find: (1) that it is necessary to restrict the taking of fish for sustained-yield purposes; and (2) that eliminating sport and commercial uses will not assure the maintenance of fish stocks on a sustained-yield basis and, thus, establishing a priority among subsistence users is also necessary. The board erred because it applied the ten criteria without making these findings.

■ The board argues that the words "customary and traditional" in AS 16.05.-940(23) authorize it to define first-tier subsistence users by their area of residence. We reject this argument for several reasons. First, the argument ignores the two-tier structure of AS 16.05.251(b) that defines only the second-tier subsistence users in terms of residency. If the legislature had intended to define the class of first-tier general subsistence users by area of residence, it would not have expressed that factor with respect to only the second tier of preferred subsistence users. Moreover, the phrase "customary and traditional" modifies the word "uses" in AS 16.05.-940(23). It does not refer to users. The 1978 subsistence law refers to "customary users" at only one point, when it defines the preferred subsistence users of the second tier with the three statutory criteria in AS 16.05.251(b).

The House Special Committee on Subsistence drafted a letter of intent for House Bill 960 [11] that supports our interpretation. With respect to AS 16.05.251(b) (which was § 6 of House Bill 960),[12] the letter of intent made clear the priority to be given subsistence uses in general over sport and commercial uses and explained the two-tier system among subsistence users.

*Sections six and seven:* These two sections, which are virtually identical for the Boards of Fisheries and the Board of Game, are intended to statutorily set out the priority given to subsistence use of

---

11. HB 960 became the 1978 subsistence law, ch. 151 SLA 1978.

12. The committee also intended to provide a priority for subsistence hunting in AS 16.05.255, as indicated in § 6 of HB 960.

fish and game resources.... Further, these sections set forth a priority of users if restrictions are needed because of the unavailability of resources. The priority list is an attempt to insure that those with the most dependence upon the fish and game resources are the last to be restricted.

*If there is a need to restrict the taking of fish or game* in order to avoid damaging the fish stocks or game populations, or in order to assure that subsistence users may continue to take fish or game, *it is the intent of the Committee that sports or commercial use be restricted before subsistence use.* If these restrictions are inadequate, restricting of subsistence use as well is authorized based upon the dependence on the resource, the local residence of the subsistence users, and the availability of alternate resources.

(Emphasis added).

Only in connection with AS 16.05.251(b) does the letter of intent discuss applying residence criteria to subsistence users, and it does so only with respect to second-tier subsistence users. With respect to the definition of subsistence uses in § 17 of House Bill 960 (now AS 16.05.940(23)), the letter of intent does not suggest that the phrase "customary and traditional" was meant to describe users as well as uses. The letter of intent states:

*Section seventeen:* Subsection (26) defines what uses can be made of subsistence caught fish and game. It allows it to be used for direct personal or family consumption, for barter as defined in subsection (27) and for sharing the subsistence caught fish and game with other persons. This subsistence caught fish and game which is shared can then only be used for personal or family consumption. This subsection also broadens the definition of family to include the extended family situation.

The letter of intent clearly expressed the legislative resolve to establish a priority for subsistence use of fish and game. The 1978 subsistence law also increased the number of uses qualifying as subsistence fishing by including trade and barter.

The board based its restrictive regulation 5 AAC 01.597, on the words "customary and traditional." The legislature did not define these words in the 1978 subsistence law. In such a case, reference to legislative history may provide an insight into the legislature's intent and a statute's meaning. *North Slope Borough v. Sohio Petroleum Corp.*, 585 P.2d 534, 540 (Alaska 1978). In the House floor debate on House Bill 960, Representative Cotton introduced an amendment to delete the words "customary and traditional" from the statute. The floor manager of the bill, Representative Anderson, opposed the amendment in the following speech:

The two words are used in this context to put some guidelines around the uses of Alaska's freedom of resources. *What we were afraid of,* it was brought to our attention by people who were concerned that this would leave the field of the definition wide open. *That newcomers just coming to the State of Alaska would* automatically be able to establish not only residency in 30 days, but *be able to go out and state that they have a customary and traditional use of Alaska's fish and game resources.* The use of customary and traditional also is in recognition of a *historical use* of fish and game for food, shelter, fuel, clothing, tools, transportation, etc. This is *not only* in conformance with the *aboriginal uses, but also* those that have come in, those people who have come in later.... [T]he *nonnative* people in the State of Alaska have established customary and traditional uses of Alaska's fish and game resources for subsistence purposes. And in order to give the Board of Fish and Game more clarification in the area, we have come up with the (inaudible) of customary and traditional rather than leaving that section wide open. *The design is not to be restrictive but to provide guidelines* and that is basically what I feel and many ... members felt it was necessary in ... adding or retaining

those two words "customary and traditional."

(Emphasis added).

■ We consider statements made by a bill's sponsor in the course of legislative deliberations to be relevant evidence when a court is trying to determine legislative intent. *Alaska Public Employees Association v. State*, 525 P.2d 12, 16 (Alaska 1974). Anderson argued for the retention of "customary and traditional" for use as a guideline. His major concern focused on the potential pressure put on resources by newcomers. In his view, the words "customary and traditional" recognized and protected a historical subsistence use by both native and non-native Alaskans. The words were not intended to restrict subsistence use.

Another part of the House debate serves to clarify the statute's meaning. Representative Parr expressed concern that the board might use AS 16.05.251(b) to eliminate Fairbanks residents from subsistence use. Some Fairbanks residents often traveled to the Chitina Dip Net Fishery near the Copper River for their fishing. Representative Anderson responded to these concerns:

> If we get into a condition where the fish stock gets down to the point where there is no way that you can allow any take, the first people that you are going to cut off are the commercial and then the sports, first, and then the last people that you are going to cut off are the subsistence people who have the greatest reliance on the resource.... [I]f it were defined that dip net fishing were for subsistence uses and not for sale or any other purpose, that would be allowed and I would think that people from Fairbanks would fall under these categories. I don't know where else they would go to ... *where people from Fairbanks make it a custom to go down to the Chitina area and if it was determined that that*

> *resource was down to the point where only subsistence would be allowed, those people would be taken care of under this section.* I don't see that it is eliminating.

(Emphasis added).

In the House debate, Anderson attempted to assure Parr that residents of urban Fairbanks could be considered priority subsistence users. Contrary to the board's interpretation of the subsistence statutes, there is no indication that legislators understood the 1978 subsistence law to restrict subsistence use to either a rural or a community context. In fact, the House debate indicates that the 1978 subsistence law was necessary to protect subsistence uses as a priority use of Alaska's fish and game resources. This intent is clearly expressed by the preamble to the subsistence law:

> [I]t is in the public interest to clearly *establish subsistence use as a priority use* of Alaska's fish and game resources *and* to *recognize the needs, customs and traditions of Alaskan residents.* The legislature further finds that beneficial use of those resources by all state residents should be carefully monitored and regulated with as much input as possible from the affected users, so that the viability of fish and game resources is not threatened and so that resources are conserved in a manner consistent with the sustained yield principle.

(Emphasis added).

■ The legislative history indicates that the legislature intended to protect subsistence use, not limit it. The words "customary and traditional" serve as a guideline to recognize historical subsistence use by individuals, both native and non-native Alaskans. In addition, subsistence use is not strictly limited to rural communities. For these reasons, the board's interpretation of "customary and traditional" as a restrictive term conflicts squarely with the legislative intent.[13]

---

**13.** The board notes that the words "customary and traditional" in the 1978 subsistence law were taken from § 703 of HR 39, 95th Congress, 2nd Session (1978), which Congress passed in modified form in 1980 as the Alaska National Interests Land Conservation Act (ANILCA), Public Law No. 96–487, 16 U.S.C. § 3113. Therefore, the board argues that the words in the

## IV. THE BOARD'S ADOPTION AND APPLICATION OF 5 AAC 01.597

We now turn to the board's interpretation of the 1978 subsistence law. In December 1980, the board met to examine the uses of salmon in Cook Inlet and to determine which uses would qualify for the subsistence use priority. Tom Lonner, the director of the subsistence section of the Alaska Department of Fish and Game, presented the department's recommendations on the subsistence statute. He suggested that the board begin its analysis of customary and traditional uses with an assessment of user profiles and use patterns on a case by case basis. Lonner noted that such information was most lacking in the major Cook Inlet subsistence fishery because of the rapid growth of subsistence uses in recent years, and that obtaining such information would be expensive.

The board did not follow Lonner's suggested approach.[14] After the board heard extensive testimony on subsistence use, its chairman appointed a committee,[15] consisting of board members and staff, to identify subsistence uses of salmon in Cook Inlet. The committee drafted ten criteria to identify subsistence uses and presented them to the board.

Lonner worked with the committee to develop the ten criteria and explained them to the board. He stated: "These tenets here are ... based on ... the evidence about four relatively self-contained communities.... If, however, you have individual applicants, ... this might not suffice as a test." Therefore, the board was fully aware of the limitations of the proposed criteria.

At its March 1981 meeting, the board received further testimony on uses of Cook Inlet salmon from the area advisory committees and several individual witnesses. After deliberation, the board decided to apply all of the ten criteria "to determine which uses are customary and traditional and therefore are eligible for the subsistence priority." Only the fisheries associated with Tyonek, English Bay and Port Graham met all ten criteria.

In its findings of fact, the board applied the ten criteria to individuals such as Madison and Gjosund. In particular, the individuals failed to meet the second criterion: "A use pattern established by an identified community, subcommunity or group having preponderant concentrations of persons showing past use."[16] The board found:

> Although some users have shown the existence of a community of interest (e.g., the Kenaitze Tribe and the Kachemak Bay Subsistence Group), these persons either are too widely dispersed or are too heterogeneous to be considered an identifiable community, subcommunity or group. On the evidence presented, the Board cannot conclude either that activities are conducted in common or that sharing or other group interchange occurs in relation to the resource.

In other words, an individual subsistence user (such as Madison or Gjosund) would not qualify for a subsistence use priority from the board unless he were part of an

---

Alaska act should have the same meaning as the words in the federal act and limit subsistence uses to residents of rural Alaska. We reject this argument for several reasons. First, § 703 of HR 39 in its 1978 form did not contain the "rural Alaska residents" limitation now found in 16 U.S.C. § 3113. Second, the Alaska House floor debate reveals that Representative Anderson, the bill's floor manager, understood the 1978 subsistence law to allow the urban residents of Fairbanks to qualify as general subsistence users. Finally, in the preamble to the 1978 subsistence law, the Alaska Legislature expressed its intent to "recognize the needs, customs and traditions of Alaskan residents." While the legislature declared that beneficial use of fish and game resources "by *all* state residents" should be carefully monitored and regulated, it did not express an intention to limit subsistence uses to rural Alaska residents.

**14.** A board member, Nick Szabo, stated that the board's limited budget prevented implementation of a case by case approach.

**15.** The board stipulated in 1982 that it violated AS 44.62.310–12 (public meeting provision) at its December 1980 meeting.

**16.** *See* 5 AAC 01.597 set out in n. 8 above.

identifiable subsistence community or group.[17] Under the board's regulation, many individual users who have historically depended on subsistence fishing are eliminated from subsistence use at the outset.

The board's regulation, 5 AAC 01.-597, is inconsistent with the legislative intent to provide guidelines for the protection of subsistence fishing. The regulation exceeds the authority delegated to the board because it operates too restrictively in its initial differentiation between subsistence and non-subsistence uses. Under a statute designed to protect subsistence uses, the board has devised a regulation to disenfranchise many subsistence users whose interests the statute was designed to protect.

The decision of the two trial courts that 5 AAC 01.597 is consistent with AS 16.05.-251(b) and AS 16.05.940(22) and (23) is REVERSED.

---

**17.** In contrast, the Commercial Fisheries Entry Commission issues commercial fishing permits on an individual basis. *See* AS 16.43.250. We do not, however, read the words "customary and traditional" as a grant of authority to the Department of Fish and Game and the Board of Fisheries to impose a "grandfather" rights system with respect to subsistence users. Imposing an equitable system of grandfather rights is an extremely complicated task, as Alaska's experience with such a system in the commercial salmon and herring fisheries has demonstrated. *See* AS 16.43.010–990 and the numerous, and ever increasing, judicial decisions interpreting this act noted in the annotations. Such a system would also be extremely controversial. It is preposterous to suppose that the legislature intended to create such a system merely by using the words "customary and traditional" in the definition of subsistence uses, with no more notice or guidance than is inherent in those words.