**Michael GRUNERT, Appellant,**

v.

**STATE of Alaska and Chignik Seiners Association, Inc., Appellees.**

**No. S–10841.**

Supreme Court of Alaska.

March 17, 2005.

Rehearing Denied April 22, 2005.

---

**39.** 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

**40.** *Id.* at 335, 96 S.Ct. 893.

Arthur S. Robinson, Robinson & Associates, Soldotna, for Appellant.

Lance B. Nelson, Assistant Attorney General, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for Appellee State of Alaska.

Gregory F. Cook, Douglas, for Appellee Chignik Seiners Association.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

EASTAUGH, Justice.

## I. INTRODUCTION

Michael Grunert, a fisher in the Chignik Purse Seine Salmon Fishery, argues that an Alaska Board of Fisheries regulation creating a Chignik cooperative fishery and allocating a quota of salmon to that fishery is invalid on grounds it exceeds the scope of the board's authority, is inconsistent with the statutory definition of "fishery" in the Limited Entry Act, is inconsistent with the Limited Entry Act's purpose and policy, and is unconstitutional. The superior court granted summary judgment in favor of the board, denied summary judgment to Grunert, and dismissed his complaint. Grunert appeals.

We reverse because we hold that the regulation is fundamentally at odds with the Limited Entry Act.[1]

## II. FACTS AND PROCEEDINGS

The Chignik commercial salmon fishery is one of Alaska's oldest commercial fisheries, dating back to the 1880s. The Chignik area communities rely almost entirely on commercial sockeye salmon fishing for their economic survival. Area L, which encompasses all coastal waters and inland drainages of the northwest Gulf of Alaska between Kilokak Rocks and Kupreanof Point, is the Chignik administrative area for commercial salmon purse seine fishing. Since 1974 only a person with a valid entry or interim entry permit issued by the Commercial Fisheries Entry Commission (CFEC) may operate gear in

---

1. AS 16.43.010 et seq.

the commercial taking of fishery resources from Area L.[2] As of the 2002 season, there were approximately 101 active CFEC permit holders in Area L.

The Chignik fishery, like other sockeye salmon fisheries in Alaska, has experienced great difficulty in competing with the farmed salmon industry in recent years. Unlike farmed salmon, which are produced year round with lower overhead costs, fresh Alaska sockeye salmon can be harvested only during summer months at higher production costs. The availability of foreign farmed salmon has caused the price of salmon to decline dramatically, resulting in significant profit declines for Chignik net gear operators.

The price decline resulted in a strike by the Chignik Seiners Association against two local processors and later caused three members of the Seiners Association to propose that the Board of Fisheries create a cooperative fishery in the Chignik Management Area to improve salmon harvesting efficiency and deliver a higher quality product. Their proposal, known as Proposal 105, stated: "The current fishing fleet is overcapitalized and the competitive harvest system does not allow for real improvements in produc[t] quality or flexibility in competing with farmed salmon." Accordingly, Proposal 105 asked the Board of Fisheries to amend the Alaska Administrative Code to allow fifty or more of the 101 Chignik CFEC permit holders to form a joint venture to combine fishing efforts. The proposal called for the joint fishery to receive a quota representing a share of the Chignik harvest equivalent to the percentage of Chignik CFEC permit holders participating in the venture, and for management of the fishery by the Alaska Department of Fish and Game (ADF & G) to attain this harvest quota.

The board ultimately promulgated 5 Alaska Administrative Code (AAC) 15.359 (2002), which provided in relevant part:

(a) The purpose of the management plan under this section is to establish the criteria and management measures for a salmon purse seine cooperative fishery in the Chignik Area.

(b) Chignik Area CFEC salmon purse seine permit holders may ... form an annual cooperative fishery ... under the following conditions:

(1) at least 51 CFEC salmon purse seine permit holders must, together, apply to the commissioner for a permit to fish as a cooperative fishery each year;

(2) an application for an annual cooperative fishery permit must be submitted to the commissioner by April 1 in 2002, or March 1 in any year after 2002; ... a copy of a cooperative fishery agreement containing the contractual terms upon which the cooperative will be operated must be submitted with the application, including articles of incorporation, corporate by-laws, partnership agreements, or other similar documents that contain the contractual terms of the cooperative;

. . . .

(c) If an annual cooperative fishery permit application meets the qualifications and requirements of this section, the commissioner, or the commissioner's designee, will issue a permit. . . .

(d) For each year that an annual cooperative fishery permit is issued under this section, the Chignik Area cooperative fishery shall be allocated a percentage of the annual Chignik Area commercial sockeye salmon harvestable surplus based on the number of permit holders participating in the cooperative as follows:

(1) if participation in the cooperative is less than 85 percent of the registered Chignik Area CFEC purse seine permit holders, the allocation to the annual cooperative fishery will be nine-tenths of one percent of the harvestable surplus for each participant in the cooperative; and

(2) if participation in the cooperative is 85 percent or more of the registered Chignik Area CFEC purse seine permit holders, the allocation will be one prorated share of the harvestable surplus for each participant in the cooperative.

**2.** AS 16.43.140(a).

(e) The commissioner may, by emergency order, open and close separate fishing periods and areas for the cooperative fishery and the open fishery as necessary to achieve the allocation established in (c) of this section. The allocation established under (c) of this section is secondary to escapement and harvest objectives, and the commissioner may, by emergency order, reduce or expand fishing opportunity to ensure escapement and harvest objectives.

. . . .

(g) In this section,

(1) "cooperative fishery" means a commercial purse seine salmon fishery in which, by agreement of the participants, the number of fishing vessels may be reduced with the intent of decreasing overhead expenses associated with commercial fishing and controlling the rate of harvest to achieve a higher quality product;

(2) "open fishery" means a commercial purse seine fishery conducted by CFEC permit holders who do not participate in the cooperative fishery.

Seventy-seven Chignik purse seine permit holders elected to form a cooperative fishery in 2002, the first year the regulation took effect. Per the terms of their cooperative agreement, eighteen vessels fished on behalf of the seventy-seven co-op members.[3]

Michael Grunert and Dean Anderson, two of the higher earning Chignik fishers, did not participate in the cooperative. They instead filed a superior court complaint in April 2002 challenging the validity of 5 AAC 15.359. The Seiners Association intervened on the side of the state. The plaintiffs moved for a preliminary injunction, but the superior court denied their motion. The plaintiffs then

moved for summary judgment. The superior court granted the state's and the Seiners Association's cross-motions for summary judgment, and held that the co-op regulation was statutorily and constitutionally valid. The superior court's memorandum decision ruled that: the board sought to advance a legitimate purpose in promulgating the regulation and did not exceed its authority by establishing a quota for Chignik seiners; the regulation does not improperly regulate cooperative corporations; there is no CFEC statutory requirement prohibiting the board's recognition of cooperatives; and the regulation does not violate article VIII of the Alaska Constitution.

Grunert appeals, arguing that (1) the co-op regulation is preempted by the Alaska Cooperative Corporations Act because 5 AAC 15.359 regulates a business entity; (2) the board did not have authority to form a cooperative that allocates fishery resources between co-op and open entry purse seine fishers because the regulation's definition of a "cooperative fishery" is inconsistent with the statutory definition of "fishery"; (3) the co-op regulation is inconsistent with the Limited Entry Act because it interferes with the "present active participation" of permit holders; and (4) the co-op regulation violates article VIII, sections 3 and 17 of the Alaska Constitution.

## III. DISCUSSION

### A. Standard of Review

 We review de novo a superior court's order granting summary judgment.[4] Because there is no contention that the Board of Fisheries failed to comply with the Administrative Procedure Act in promulgating 5 AAC 15.359, we presume that the regulation is valid and place the burden of prov-

---

3. Fewer than eighty-five percent of Chignik purse seine permit holders elected to form a cooperative fishery in 2002. Each of the seventy-seven co-op members was thus individually allocated a 0.9% share of the harvest of fish surplus to spawning requirements, bringing the co-op's total share to 69.3%. The remaining 30.7% of the surplus was allocated to those permit holders who had not joined the cooperative fishery. Thus, assuming, for example, that the total harvest surplus for the Chignik fishery was

100,000 salmon, the cooperative would be entitled to take a total of 69,300 salmon even though only eighteen vessels fished on behalf of seventy-seven co-op permit holders. In contrast, the remaining twenty-four permit holders in the open fishery would be entitled to take a total of only 30,700 salmon.

4. *Alaska Fish Spotters Ass'n v. State, Dep't of Fish & Game*, 838 P.2d 798, 800 (Alaska 1992).

ing otherwise on the challenging party.[5] We will uphold the regulation as long as it is " 'consistent with and reasonably necessary to implement the statutes authorizing [its] adoption.' "[6]

Accordingly, we consider first "whether the [b]oard exceeded its statutory mandate in promulgating the regulation, either by pursuing impermissible objectives or by employing means outside its powers."[7] Determining the extent of an agency's authority involves the interpretation of statutory language, a function uniquely within the competence of the courts and a question to which we apply our independent judgment.[8] Second, we consider whether the regulation is reasonable and not arbitrary.[9] Where highly specialized agency expertise is involved, we will not substitute our own judgment for the board's.[10] Our role is to ensure only that the agency has taken a "hard look at the salient problems and has genuinely engaged in reasoned decision making."[11] And third, we consider whether the regulation conflicts with any other state statutes or constitutional provisions.[12]

## B. The Department of Commerce and Economic Development's Authority To Allow a Cooperative Fishery Does Not Preclude the Board from Adopting a Regulation Authorizing the Formation of a Cooperative Fishery.

Grunert first argues that the co-op regulatory scheme is contrary to AS 10.15.580, which vests in the Alaska Department of Community and Economic Development the power to allow cooperatives.[13] The superior court concluded that the regulation does not purport to create an unrecognized business entity or to amend a currently recognized business entity in the state. It also ruled that the regulation does not require the cooperative fishery to form itself into any particular type of legally recognized business.

The challenged co-op regulation requires only that a copy of the contractual terms of the cooperative agreement be submitted with an application to form a cooperative. It does not, however, specify any substantive requirements for the contractual terms related to the cooperative's operation. The Alaska Cooperative Corporation Act states that "[a] cooperative *may* be organized under this chapter for any lawful purpose,"[14] but does not draw the outer boundaries of the authority of the Department of Commerce and Economic Development or confer on the department exclusive jurisdiction to create cooperatives. The Alaska Cooperative Corporation Act therefore does not impliedly preclude the Board of Fisheries from adopting a regulation authorizing permit holders to form a cooperative fishery.

## C. The Co–Op Regulation Pursues Permissible Objectives.

Grunert contends that the Board of Fisheries does not have authority to de-

---

5. *Lakosh v. Alaska Dep't of Envtl. Conservation,* 49 P.3d 1111, 1114 (Alaska 2002).

6. *Interior Alaska Airboat Ass'n v. State, Bd. of Game,* 18 P.3d 686, 689 (Alaska 2001) (quoting *State, Bd. of Marine Pilots v. Renwick,* 936 P.2d 526, 531 (Alaska 1997)).

7. *Meier v. State, Bd. of Fisheries,* 739 P.2d 172, 173 (Alaska 1987).

8. *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.,* 746 P.2d 896, 904 (Alaska 1987).

9. *Meier,* 739 P.2d at 173 (citing *Kelly v. Zamarello,* 486 P.2d 906, 911 (Alaska 1971)).

10. *Lakosh,* 49 P.3d at 1114; *Meier,* 739 P.2d at 174; *Kingery v. Chapple,* 504 P.2d 831, 835 (Alaska 1972) ("[T]he 'wisdom' of a regulation is not a subject of review.").

11. *Interior Alaska Airboat Ass'n,* 18 P.3d at 690; *Gilbert v. State, Dep't of Fish & Game, Bd. of Fisheries,* 803 P.2d 391, 398 (Alaska 1990) (citations omitted).

12. *O'Callaghan v. Rue,* 996 P.2d 88, 95 (Alaska 2000).

13. AS 10.15.005 provides: "A cooperative may be organized under this chapter for any lawful purpose, except for the purpose of banking or insurance or the furnishing of electric or telephone service." AS 10.15.580 states:

 The [D]epartment [of Community and Economic Development] has the power and authority reasonably necessary to administer this chapter efficiently and to perform the duties imposed by this chapter.

14. AS 10.15.005 (emphasis added).

termine qualifications for entry into commercial salmon fisheries. The board exceeds its statutory mandate in promulgating a regulation if it pursues impermissible objectives or employs means outside its powers.[15] Alaska Statute 16.05.251 authorizes the Board of Fisheries to adopt regulations for, among other things, "regulating commercial, sport, guided sport, subsistence, and personal use fishing as needed for the conservation, development, and utilization of fisheries."[16] "Conservation" refers to the "controlled utilization of a resource to prevent its exploitation, destruction or neglect."[17] "Development" relates to the "management of a resource to make it available for use."[18] We have held that "the duty to conserve and develop fishery resources implies a concomitant power to allocate fishery resources among competing users."[19]

The board refers to the language of the co-op regulation itself to argue that it is consistent with authorized purposes. The regulation defines a "cooperative fishery" as:

a commercial purse seine salmon fishery in which, by agreement of the participants, the number of fishing vessels may be reduced with the intent of decreasing overhead expenses associated with commercial fishing and controlling the rate of harvest to achieve a higher quality product.[20]

The board contends that the regulation "increases the economic efficiency of commercial fishing by allowing a lower-cost option for harvesting fish, and ... increases the quality of the fish product by providing for a more controlled rate of harvest."

The co-op regulation does not affirmatively promote specific conservation goals permitted under the board's authorizing statute; rather, 5 AAC 15.359(e) states that the regulation's allocation is "secondary to escapement and harvest objectives, and the com-

missioner may, by emergency order, reduce or expand fishing opportunity to ensure escapement and harvest objectives." The allocation itself is thus not inherently based on conservation objectives but instead is subject to those objectives. The regulation's language demonstrates that its primary focus is on the economic circumstances of the Chignik fishermen, such as those economic hardships imposed by declining salmon prices, declining permit values, and rising operating costs. These concerns do not pertain to the conservation of the salmon stock in the fishery. As the board argues, the regulation may facilitate the management of the fisheries by the Department of Fish and Game by reducing the number of vessels in the fleet. But this benefit is only minor and incidentally related to conservation goals.

The board urges, however, that increased economic efficiency in fishing serves a development purpose. It contends that if participation in a fishery becomes cost-prohibitive, the fishery will no longer be viable and fishery resources will not be developed at all. To the extent increased economic efficiency is necessary to the utilization and survival of the Chignik fishery, we agree that the co-op regulation pursues a permissible objective. The apparent focus on economic development and utilization does not establish that the regulation exceeded the board's statutory authority, nor does the lack of prominence of a goal of regulating conservation.

### D. The Co–Op Regulation Employs Means Outside the Board's Authorized Powers To Allocate Within a Single Fishery.

■ Grunert broadly argues that the establishment of a cooperative fishery is inconsistent with the statutory definition of "fishery" contained in the Limited Entry Act. The Chignik fishery encompasses Administrative

**15.** *Meier,* 739 P.2d at 173.

**16.** AS 16.05.251(a)(12).

**17.** *Interior Alaska Airboat Ass'n,* 18 P.3d at 691 (quoting *Alaska Fish Spotters Ass'n v. State, Dep't of Fish & Game,* 838 P.2d 798, 800 (Alaska 1992)).

**18.** *Id.* (quoting *Alaska Fish Spotters,* 838 P.2d at 800).

**19.** *Meier,* 739 P.2d at 174 (citing *Kenai Peninsula Fisherman's Co-op. Ass'n v. State,* 628 P.2d 897, 903 (Alaska 1981)).

**20.** 5 AAC 15.359(g)(1).

Area L, which includes the Chignik River system and approximately 110 other salmon-producing streams. The Department of Fish and Game manages five fishing districts within the Chignik commercial salmon management area so that escapement goals are achieved during the harvest of salmon that are surplus to spawning requirements. Salmon may be taken in the Chignik fishery only by purse seine or hand purse seine.[21]

The Limited Entry Act defines "fishery" as "the commercial taking of a specific fishery resource in a specific administrative area with a specific type of gear."[22] The board's authorizing statute, AS 16.05.251(e), permits the board to allocate fishery resources "among personal use, sport, guided sport, and commercial fisheries." Grunert contends that because the cooperative fishery and the open fishery use the same gear, the board has impermissibly allocated resources within a single homogeneous commercial fishery by assigning different quota shares, different fishing periods, and different fishing areas to the two groups. The board asserts that arguments by Grunert based on the statutory definition of "fishery" are moot because a subsequent amendment to the co-op regulation now authorizes different gear types in the cooperative fishery.[23] The board also contends that nothing in AS 16.05.251(e) requires it to allocate resources only among fisheries rather than within a single fishery.

We were informed for the first time at oral argument that the amended regulation now permits cooperative fishers to use leads on the purse seines. Assuming that a substantive difference between co-op fishery gear and open fishery gear presently exists,[24] we agree that Grunert's argument that use of the same gear by both groups conflicts with the statutory definition of "fishery" is now moot. We nonetheless consider this issue under the public interest exception to the mootness doctrine because there may be a continuing dispute with regard to the new gear permitted by the amended regulation.[25]

The authorizing statute states that the board "may allocate fishery resources among personal use, sport, guided sport, and commercial fisheries."[26] The board contends that because the use of "may" is permissive rather than mandatory, the statute does not require the board to allocate resources only among the specified fisheries. Although the statutory language is permissive in giving the board discretion with respect to the initial decision whether to allocate at all, it does specify that the allocation is to be "among," not "within," the listed categories of fisheries. "Among" implies a construction of subsection .251(e) that supports Grunert's argument that the permitted allocations must be "between" the fisheries. It does not imply that "within" any given fishery the board may allocate fish.

The allocation factors set out in subsection .251(e)'s subparts confirm that the intended allocation is "among," i.e., between the separate fisheries. These factors refer repeatedly to "each fishery" and take into consideration the unique aspects of each fishery, such

21. 5 AAC 15.330.

22. AS 16.43.990(4) (" '[F]ishery' means the commercial taking of a specific fishery resource in a specific administrative area with a specific type of gear; however, the commission may designate a fishery to include more than one specific administrative area, gear type, or fishery resource.").

23. 5 AAC 15.359(c) (am.3/6/03).

24. The board amended the regulation after this appeal commenced. The record (and briefing) do not explain the practical effect of the amendment and any gear differences. While the use of feeder nets may give the cooperative a fishing advantage over open fishers, it is not self-evident that the leads would result in materially different equipment.

25. *Fairbanks Fire Fighters Ass'n, Local 1324 v. City of Fairbanks,* 48 P.3d 1165, 1168 (Alaska 2002) (setting forth these bases for reviewing mooted issue: (1) whether disputed issues are capable of repetition, (2) whether application of mootness doctrine may repeatedly circumvent review, and (3) whether issues presented are so important to public interest as to justify overriding mootness doctrine); *Peninsula Mktg. Ass'n v. State,* 817 P.2d 917, 920 (Alaska 1991) (recognizing authority of board to make allocation decisions as repeated issue, ease of evading review by annual amendments, and public importance of impact upon allocation of Alaska's fishery resources).

26. AS 16.05.251(e).

as its history, the number of people participating in it, its importance to the state's economy, and its importance in providing recreational opportunities.[27] The allocation factors provide no guidance as to how to evaluate sub-fisheries or subclassifications for purposes of allocating resources within a single "fishery" as that word is defined by AS 16.43.990(4). In addition, we note that the legislature authorized the CFEC, not the board, to split a fishery geographically and to create a new administrative area.[28]

Therefore, if the cooperative fishery and the open fishery used the same type of gear in the same administrative area to take the same fishery resource, an allocation of resources to the cooperative would be an impermissible allocation within a single fishery.

### E. The Co-op Regulation Fundamentally Contradicts the Intended Purposes of the Limited Entry Act.

█ Assuming the cooperative fishery and the open fishery use different gear, we must still consider Grunert's argument that the regulation conflicts with the purpose and policy behind the Limited Entry Act. A regulation may be invalid if it is fundamentally inconsistent with the legislative intent underlying the controlling statute.[29] To determine whether the cooperative regulation is consistent with the Limited Entry Act, we look to the act's history and legislative purposes.

#### 1. History of the Limited Entry Act

Before statehood, commercial salmon fishing in Alaska was dominated by large operators of fleets and fish traps, so much so that the drafters of the Alaska Constitution submitted an ordinance banning commercial fish traps to an Alaska-wide vote.[30] Doing so reflected the drafters' belief that Alaska's salmon should belong to all Alaskans.[31] The drafters consequently also proposed the common use provisions of the Alaska Constitution.[32]

These common use provisions caused early attempts to limit participation in fisheries to be deemed unconstitutional. The legislature made one such attempt in 1961 when it enacted a statute authorizing the Board of Fish and Game to promulgate regulations temporarily closing salmon fishing areas to nonresidents when yearly runs proved to be inadequate to sustain Alaska resident commercial fishers.[33] A law enacted in 1968 attempted to limit the issuance of salmon net gear licenses for particular salmon registration areas to persons previously holding either a salmon gear license or a commercial license during three years of active engagement in commercial fishing.[34] Both of these acts ultimately faced legal challenges based on equal protection and other constitutional grounds.[35]

27. AS 16.05.251(e)(1), (2), (5), (7).

28. AS 16.43.100(a)(3), .990(1), .990(4).

29. *Madison v. Alaska Dep't of Fish & Game*, 696 P.2d 168, 178 (Alaska 1985) (concluding board's regulation interpreting words "customary and traditional" was inconsistent with legislative intent behind Alaska's 1978 subsistence law).

30. *Brooks v. Wright*, 971 P.2d 1025, 1030 (Alaska 1999).

31. *Id.* at 1030 n. 31.

32. *Metlakatla Indian Cmty., Annette Island Reserve v. Egan*, 362 P.2d 901, 905 (Alaska 1961), *vacated on other grounds*, 369 U.S. 45, 82 S.Ct. 552, 7 L.Ed.2d 562 (1962). Article VIII, section 3 of the Alaska Constitution states: "Wherever occurring in their natural state, fish, wildlife, and waters are reserved to the people for common use." Section 4 provides: "Fish, forests, wildlife, grasslands, and all other replenishable resources belonging to the State shall be utilized, developed, and maintained on the sustained yield principle, subject to preferences among beneficial uses." Section 15 states: "No exclusive right or special privilege of fishery shall be created or authorized in the natural waters of the State." Article VIII, section 17 provides: "Laws and regulations governing the use or disposal of natural resources shall apply equally to all persons similarly situated with reference to the subject matter and purpose to be served by the law or regulation."

33. Ch. 62, SLA 1961.

34. Ch. 186, SLA 1968.

35. *Bozanich v. Reetz*, 297 F.Supp. 300, 304 (D.Alaska 1969), *vacated*, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970); *Brown v. Anderson*, 202 F.Supp. 96, 103 (D.Alaska 1962) (declaring 1961 law to be invalid as violating United States Constitution's privileges and immunities and commerce clauses, as well as Alaska Constitution's equal protection and due process clauses).

In 1971 the Alaska Superior Court held that the 1968 law violated article VIII, section 15, of the Alaska Constitution, which provides that "[n]o exclusive right or special privilege of fishery shall be created or authorized in the natural waters of the State." [36]

To address the constitutional concerns identified by the superior court in 1971 in *Bozanich v. Norenberg,* the Alaska Legislature in 1972 proposed a constitutional amendment to add this language to article VIII, section 15:

> This section does not restrict the power of the State to limit entry into any fishery for purposes of resource conservation, to prevent economic distress among fishermen and those dependent on them for a livelihood and to promote the efficient development of aquaculture in the State.[37]

The voters approved the amendment in 1972.[38]

The legislature then enacted the Limited Entry Act, effective as of 1974.[39] The stated purposes of the Act included promoting "the conservation and the sustained yield management of Alaska's fishery resource and the economic health and stability of commercial fishing in Alaska by regulating and controlling entry of participants and vessels into the commercial fisheries in the public interest and without unjust discrimination." [40]

One method the legislature used to limit entry into the commercial fisheries was restricting eligibility for permits under the new system. Under the Limited Entry Act, the Commercial Fisheries Entry Commission determines who is eligible to take fish.[41] The CFEC is authorized by statute to accept applications from only those persons "who have harvested fishery resources commercially while participating in the fishery as holders of gear licenses." [42] When the legislature enacted the Limited Entry Act, a gear license was a personal license and gear could only be fished in the presence of the named licensee.[43] A gear license could be transferred only in cases of hardship if the original licensee became unable to fish.[44] Only individuals who had held gear licenses, as opposed to their partners, could apply for limited entry permits.[45] Hence even commercial fishers who were crew members and who fished with gear license holders but who did not themselves hold licenses were ineligible to receive entry permits under the new limited system.[46] These features of the limited entry system reflect an intention that permit holders be, at minimum, individuals who were actively fishing.

The Limited Entry Act also commands the CFEC to establish a standard for the initial issuance of limited entry permits.[47] To pre-

**36.** *Commercial Fisheries Entry Comm'n v. Apokedak,* 606 P.2d 1255, 1259 (Alaska 1980) (citing *Bozanich v. Norenberg,* Civil Case No. 70–389 (Alaska Super., Mar. 8, 1971)).

**37.** 1971 Senate Joint Resolution No. 10 (HCS CSSJR 10). Alaska Const. art. VIII, § 15; *State v. Ostrosky,* 667 P.2d 1184, 1189 (Alaska 1983) ("[T]he conclusion is inescapable that the purpose of the amendment was to authorize, so far as the state constitution is concerned, a limited entry system.").

**38.** Gordon Scott Harrison, Alaska's Constitution. A Citizen's Guide app. (3d ed.1992).

**39.** Ch. 79, § 1, SLA 1973.

**40.** AS 16.43.010.

**41.** *See, e.g.,* AS 16.05.251(a)(11) (explicitly denying board authority to establish times and dates for issuance and transfer of limited entry permits).

**42.** AS 16.43.260(a).

**43.** *Commercial Fisheries Entry Comm'n v. Apokedak,* 680 P.2d 486, 488 (Alaska 1984).

**44.** *Id.*

**45.** *Id.; see also Simpson v. State, Commercial Fisheries Entry Comm'n,* 101 P.3d 605, 615 (Alaska 2004) (reaffirming that non-licensed fishers cannot receive past participation points); *Crivello v. State,* 59 P.3d 741, 745–46 (Alaska 2002) (prohibiting partners from distributing points between themselves, even if one partner does not need points himself to obtain his limited entry permit).

**46.** *Grunert v. State, Commercial Fisheries Entry Comm'n,* 735 P.2d 118, 119, 121–22 (Alaska 1987) (holding that operating under father's gear license while father was ill did not qualify as harvesting fishery resources commercially while participating in fishery as gear license holder); *Ostrosky,* 667 P.2d at 1188.

**47.** AS 16.43.250(a).

vent unjust discrimination, the CFEC is to adopt regulations that take into account the hardship imposed on the applicant upon exclusion from the limited entry fishery and assign priority classifications for similarly situated applicants based on the following factors: [48]

(1) degree of economic dependence upon the fishery, including, when reasonable for the fishery, the percentage of income derived from the fishery, reliance on alternative occupations, availability of alternative occupations, investment in vessels and gear;

(2) extent of past participation in the fishery, including, when reasonable for the fishery, the number of years of participation in the fishery, and the consistency of participation during each year.[49]

In recognizing actual dependence on the fisheries and actual participation, these ranking factors protect those who actually take fish.[50]

Actual participation also matters when it comes to the issuance of subsequent limited entry permits. Under AS 16.43.330(a), when the number of permits issued for a fishery drops below the optimum number established by the CFEC, it issues new entry permits to applicants "presently able to engage actively in the fishery." Alaska Statute 16.43.225(e) requires that applicants for interim-use permits for a fishery under a moratorium establish "the present ability and intent to participate actively in the fishery." During the period of time between the establishment of the maximum number of entry permits and the initial issuance of permits, interim-use permit applicants similarly must establish "their present ability to participate actively in the fishery." [51]

Other provisions in the Limited Entry Act also emphasize economic dependence and participation. The Act authorizes the CFEC, not the board, to establish the optimum number of entry permits for each fishery based on what "will result in a reasonable average rate of economic return to the fishermen participating in that fishery, considering time fished and necessary investments in vessels and gear." [52] Another factor to be considered in determining the optimum number is the "number of entry permits sufficient to avoid serious economic hardship to those currently engaged in the fishery, considering other economic opportunities reasonably available to them." [53] Again, these provisions in the Act contemplate economically dependent individuals who invest time and money in actually fishing.

The repeated references to participation and dependence throughout the Limited Entry Act demonstrate that a central premise of the statutory scheme is that the permit holder is an individual who will fish. Accordingly, the act prohibits permit holders from leasing their permits.[54] It also requires crew members to fish only in the presence of a permit holder who is "actively engaged in the operation of the gear." [55] Moreover, the Act limits operation of gear to persons with valid entry permits,[56] while defining "person" as a natural person, excluding corporations, companies, partnerships, firms, associations, organizations, joint ventures, trusts, societies, or any other legal entity other than a natural person.[57] These provisions reinforce the point we explained in *Johns v. Commercial Fisheries Entry Commission:* "[T]he legislature intended the number of permits initially

**48.** *Commercial Fisheries Entry Comm'n v. Apokedak,* 606 P.2d 1255, 1261 (Alaska 1980); *State, Commercial Fisheries Entry Comm'n v. Templeton,* 598 P.2d 77, 78 (Alaska 1979).

**49.** AS 16.43.250(1)-(2).

**50.** *Younker v. Alaska Commercial Fisheries Entry Comm'n,* 598 P.2d 917, 920 (Alaska 1979) (declining to consider preparatory efforts to fish as past participation because "past participation coincides with the legislative view that hardship be measured according to the actual taking of fish in the past").

**51.** AS 16.43.210(a).

**52.** AS 16.43.290(1).

**53.** AS 16.43.290(3).

**54.** AS 16.43.150(g)(1).

**55.** AS 16.43.140(b).

**56.** AS 16.43.140(a).

**57.** AS 16.43.990(7).

issued to reflect actual use.... 'The Act was designed to protect the reliance interests of all individuals using the fishery as well as aiding the dependent fishermen.' "[58]

## 2. The cooperative fishery

The board argues that nothing in the Limited Entry Act explicitly requires active participation in the fishery by Chignik co-op fishers. For example, it contends that although AS 16.43.140(a) requires gear operators to be permit holders, the statute does not require permit holders themselves to operate gear. With respect to statutes requiring transferees and interim use applicants to demonstrate a "present ability to participate actively in the fishery," the board argues that the "ability" to participate differs from actual participation.[59]

To read these provisions so restrictively, however, is to read permit requirements as though they are completely divorced from the permits themselves. Participation by the individual is inherent in the limited entry permit system. The Chignik cooperative fishery scheme is fundamentally at odds with this premise because it allows people who are not actually fishing to benefit from the fishery resource. That the statutes frequently refer to only the "ability" to participate actively in the fishery rather than actual participation is not unexpected because transferees and interim use permit applicants cannot actually participate in the fishery until permits are in fact issued.

The board's argument that the Chignik co-op regulation itself does not prevent co-op fishers from participating actively is also unpersuasive. If every co-op fisher decided to fish, the stated goals of the regulation—reducing overhead costs and improving fish quality through controlled harvesting—would be defeated, and it would be as if no cooperative existed. Integral to the co-op regulation is an assumption that in practice not every individual co-op member will fish, as demonstrated in 2002 when only eighteen vessels fished on behalf of the seventy-seven members of the cooperative. Because the regulation allows co-op members to benefit and receive remuneration from the fishery without actual participation, it actually discourages active participation.

The co-op system makes it possible for permit holders without gear or vessels to have someone else fish on their behalf, leaving them free to pursue other occupations. A member of the co-op, for example, theoretically can indirectly "fish" while holding down an office job or sitting at home because the regulation allows another co-op member to fish the absentee member's entire quota for him or her. The co-op fisher in this scenario sharply diverges from the model of the economically dependent fisher whom the Limited Entry Act was intended to protect.[60] In fact, many economically dependent fishers may suffer greater economic distress as a result of the cooperative fishery. Crew members, who depend on permit holders for employment, would also lose income because the cooperative fishery requires fewer vessels and fewer crew to take fish.[61]

---

58. *Johns v. Commercial Fisheries Entry Comm'n*, 758 P.2d 1256, 1262 (Alaska 1988) (quoting *Rutter v. State*, 668 P.2d 1343, 1347 (Alaska 1983)).

59. AS 16.43.170(b); AS 16.43.210(a).

60. AS 16.43.250(a)(1) (measuring economic dependence by "percentage of income derived from the fishery, reliance on alternative occupations, availability of alternative occupations, investment in vessels and gear"); AS 16.43.290 (establishing optimum number of permits based on "reasonable average rate of economic return to the fishermen participating in that fishery, considering time fished and necessary investments in vessels and gear" and avoidance of "serious economic hardship to those currently engaged in the fishery, considering other economic opportunities reasonably available to them").

61. 5 AAC 15.359(g)(1) (referring to reduction of number of vessels and decrease in overhead expenses associated with commercial fishing). To the extent the regulation reduces the number of CFEC permits actually fished, it may also interfere with the CFEC's ability to determine the optimum number of permits per fishery, which is partly based on time spent fishing and investment in vessels and gear. AS 16.43.290. Because the co-op regulation allows any number of permit holders to fish on behalf of other permit holders in the cooperative, it destroys any relation between the number of permits issued per fishery and the ultimate number of participating vessels and units of gear.

The working assumption since Alaska became a state has been that individuals operate Alaska's commercial salmon fisheries. The co-op regulation in contrast transforms the limited entry permit from what used to be a personal gear license into a mere ownership share in a cooperative organization. As the parties conceded at oral argument, if the Board of Fisheries can create this regulatory scheme for the Chignik fishery, it can do the same thing for every salmon fishery in Alaska. Before this regulatory scheme accomplishes such radical departure from the historical model of limited entry fisheries in Alaska and the spirit of the Limited Entry Act, however, we conclude that the legislature must first authorize the board to approve cooperative salmon fisheries.[62]

The legislature might well conclude that it is necessary to amend the Limited Entry Act to allow the creation of cooperative fisheries, perhaps by the board if not by the CFEC, to advance the same purposes relied upon by the board in promulgating 5 AAC 15.359. But because it has not yet done so, we must hold that the regulation is invalid.

## IV. CONCLUSION

Because 5 AAC 15.359 conflicts with both the Limited Entry Act's definition of "fishery" and stated purposes, we need not reach Grunert's constitutional claims. We REVERSE the superior court's grant of summary judgment to the board and REMAND for further proceedings consistent with this opinion.

CARPENETI, Justice, dissenting.

Faced with an economic crisis of historic proportions in the Chignik commercial salmon fishery,[1] the Board of Fisheries acted to provide relief. Under its broad statutory authority, the board enacted a regulation allowing the establishment of a cooperative fishery. The great majority of Chignik fishers joined. The superior court upheld the board's regulation against challenge. But today's Opinion, misinterpreting the statute authorizing the regulation, looking to the wrong statute to assess the regulation's consistency with its controlling statute, and ignoring the deference our case law requires us to afford to an agency's expertise, strikes down the regulation. I respectfully dissent.

Today's Opinion holds that the Board of Fisheries' regulation exceeds the language of the board's statutory authority (Part III.D.) and conflicts with the Limited Entry Act's purposes and statutory provisions (Part III. E.). I would affirm the superior court's holdings that the board acted within its statutory authority and that its regulation did not directly conflict with the Limited Entry Act.[2]

---

**62.** *Baldridge v. State*, 382 P.2d 903, 905 (Alaska 1963) ("[The Board of Fish and Game's] regulation to be valid must be in harmony and not in conflict with the policy established by the legislature.").

**1.** The problems facing Chignik fishers were set out to the Board of Fisheries in these terms:

> **Problem:** The substantial downturn in the salmon market over the past decade has reduced fishing income drastically while operating expenses have continued to increase every year. Fuel, grocery, and insurance expenses have increased at or above inflation rates over the past ten years while salmon prices have declined to less than 50% of what they were just over a decade ago. The current fishing fleet is overcapitalized and the competitive harvest system does not allow for real improvements in produce quality or flexibility in competing with farmed salmon in foreign or domestic markets. The lower salmon prices drop, the more pronounced these problems become.

> **What will happen if nothing is done?**
> 1. Chignik Bay, Chignik Lagoon, Chignik Lake, Perryville, Ivanoff Bay residents, and all Chignik fishermen will continue to endure severe economic hardships as income from salmon fishing continues to decline due to poor prices and ever-increasing operating expenses.
> 2. Limited entry permits will continue their exodus from rural to urban interests.
> 3. Permit values will continue to plummet.
> 4. Safety will be compromised as fishermen are forced to take greater risks to try to make a living and to hire inexperienced crew members because no crew members are available.

> Proposal 105 to the Board of Fisheries, Chignik Area Salmon Management Plan.

**2.** Because I believe the regulation survives Grunert's challenges that its enactment exceeded the board's statutory authority and conflicts with the Limited Entry Act, I would reach his constitutional challenges.

### I. The Board Acted Within Its Authorized Powers in Adopting the Regulation.

A party challenging a regulation bears the burden of showing that adoption of the regulation is inconsistent with the adopting agency's controlling statute.[3] We presume that a regulation promulgated in accordance with the Administrative Procedure Act is valid,[4] and we will uphold the regulation so long as it is "consistent with and reasonably necessary to implement the statutes authorizing [its] adoption" and it is "reasonable and not arbitrary."[5] Because Grunert does not claim that the regulation in question in this case, 5 AAC 15.359, was not promulgated in accordance with the APA, Grunert bears the burden of showing that it is inconsistent with the Fish and Game Code or is unreasonable and arbitrary.

The Board of Fisheries is governed by Article 2 of the Fish and Game Code, AS 16.05. The legislature created the board for the general purposes of "the conservation and development of the fishery resources of the state."[6] In *Kenai Peninsula Fisherman's Cooperative Association v. State*,[7] in determining that "conservation" and "development" allowed the board to regulate utilization of resources among various user groups, we held that "conservation laws such as fish and game laws should be liberally construed to achieve their intended purpose."[8]

Following our decision in *Kenai Peninsula*, the legislature broadly granted the board the authority in AS 16.05.251 to enact regulations concerning sixteen enumerated types of issues, including, for example: establishing open and closed seasons and areas; setting quotas and bag limits; and "establishing the means and methods employed in the pursuit, capture, and transport of fish." Most relevant here, the legislature in AS 16.05.251(a)(12) granted the board the power to regulate "commercial, sport, guided sport, subsistence, and personal use fishing as needed for the conservation, development and utilization of fisheries."[9]

Part III.C. of today's Opinion correctly rejects Grunert's argument that the co-op regulation pursues objectives not permitted by statute. In so doing, it concludes that the regulation properly concerns "development" and "utilization" of the resource. While I believe that this regulation also serves "conservation" objectives,[10] I otherwise agree with this portion of the Opinion.

However, Part III.D. of the Opinion mistakenly accepts Grunert's argument that the regulation nonetheless exceeds the board's authority. The Opinion is based on a narrow reading of AS 16.05.251(e) (an allocation provision) and an incorrect interpretation of the statutory definition of the term "fishery."

Alaska Statute 16.05.251(e) provides that the board, when regulating a permitted subject, "may allocate fishery resources among personal use, sport, guided sport, and commercial fisheries." Because the Opinion concludes that the entire Chignik purse seine salmon fishery—cooperative and competitive

---

**3.** "When an agency has adopted regulations under a delegation of authority from the legislature and using the process prescribed by the Administrative Procedure Act, we presume that the regulations are valid and place the burden of proving otherwise on the challenging party." *Lakosh v. Alaska Dep't of Envtl. Conservation*, 49 P.3d 1111, 1114 (Alaska 2002).

**4.** *Id.*

**5.** *Interior Alaska Airboat Ass'n v. State, Bd. of Game*, 18 P.3d 686, 689–90 (Alaska 2001) (citations omitted).

**6.** AS 16.05.221(a).

**7.** 628 P.2d 897 (Alaska 1981).

**8.** *Id.* at 903.

**9.** *See id.* at 902–03 & n. 9.

**10.** We have defined "conserv[ation]" to imply "controlled utilization of a resource to prevent its exploitation, destruction or neglect." *Interior Alaska*, 18 P.3d at 691 (citation omitted). The regulation was designed in no small part to improve the quality of fish being brought to market. Under the previous competitive harvest system, such quality was compromised by time and profit pressures, which caused, among other things, improper and excessive handling. The attempt to remedy such quality decline through the regulation was therefore a measure to prevent the "exploitation, destruction or neglect" of a fishery resource. In short, it served a conservation purpose.

fishers included—constitutes a single fishery under the statutory definition, it strikes down the regulation, reading AS 16.05.251(e) to permit allocations "between" fisheries, but not "within" a single fishery. This conclusion is misguided for several reasons.

First, the Opinion's premise—that the "cooperative fishery" and the "competitive fishery" cannot constitute separate fisheries—is clearly wrong. The Fish and Game Code, the board's controlling statute, defines a "fishery" as "a specific administrative area in which a specific fishery resource is taken with a specific type of gear." [11] In fitting both groups into a single fishery, the majority ignores the fact—raised in the state's briefing to this court—that the board has subsequently passed a regulation permitting the cooperative fishers to use types of gear otherwise denied to competitive fishers. Thus, because the two groups have access to differing types of gear, the language easily accommodates the conclusion that these are two fisheries.

Moreover, even ignoring the subsequent regulation, the differences in operation between the "cooperative fishery" and the "competitive fishery" are sufficient to qualify as different "types of gear." The regulation defined "cooperative fishery" as "a commercial purse seine salmon fishery in which, by agreement of the participants, the number of fishing vessels may be reduced with the intent of decreasing overhead expenses associated with commercial fishing and controlling the rate of harvest to achieve a higher quality product." While Grunert complains that the distinguishing trait relates only to business structure and not to tangible gear, the definition of fishery is not so restrictive. "[T]ype of gear" is defined broadly and includes, by way of example, such subclassifications as that between "sport gear and guided sport gear." [12] Sport fisheries and guided sport fisheries use the same type of "gear" (hook and line) but have different economic purposes. In light of the liberal construction given to these statutes, such a difference should be sufficient to avoid striking down the regulation based on a definition.

Second, even accepting the notion that the cooperative fishery and the competitive fishery constitute only one fishery, the Opinion's conclusion regarding permitted allocation is incorrect. It places too much weight on a questionable definition of the preposition "among" in AS 16.05.251(e). In reading "among" to permit allocations "between" the fisheries, but not "within" a single fishery, the Opinion conflates the terms "among" and "between." Yet there is a distinction between these two words: "*Between* expresses one-to-one relations of many things, and *among* expresses collective and undefined relations." [13] Thus, while "between" would apparently preclude different allocations to members of the same fishery (i.e., "within" a fishery), "among" could possibly lead to a different result. The legislature could have used the word "between" in this provision, but it did not.

This reading also conflicts with our case law. We have previously held that the board possesses broad allocation powers. Before there was a statutory allocation provision, we allowed the board to regulate the utilization of fishery resources "by various user groups." [14] Later, we upheld a regulation allocating resources between "two competing subgroups of commercial users." [15] We have also specifically rejected a lower court's interpretation of AS 16.05.251(e) that prohibited intra-group allocations (that is, between two or more commercial fisheries), stating that "[t]he phrase 'among personal use, sport, and commercial fishing' does not on its

---

11. AS 16.05.940(14). While this definition is essentially the same as the definition of "fishery" in the Limited Entry Act, the Opinion errs in referring solely to the Limited Entry Act's definition. If Grunert's argument was based solely on that Act's definition—which it is not—he would be required to show that the regulation is in "direct conflict" with the Act, not just that it is inconsistent. *See infra* Part II.

12. AS 16.05.940(14)(B).

13. Bryan A. Garner, A Dictionary of Modern Legal Usage at 85 (1987).

14. *Kenai Peninsula Fisherman's Coop. Ass'n v. State,* 628 P.2d 897, 903 (Alaska 1981).

15. *Meier v. State, Bd. of Fisheries,* 739 P.2d 172, 174 (Alaska 1987).

face indicate any intent to exclude any subsets of the phrase, such as intra-commercial allocations." [16]

Moreover, we have previously held that the board may allocate resources within subclasses of a fishery, just as the board did in the present case. In *State v. Hebert*,[17] we adopted the reasoning of the court of appeals [18] in upholding a board regulation that created two "superexclusive" herring sac roe fisheries within a single management area and provided that a person who fished one "superexclusive" fishery could not fish another "superexclusive" fishery or a nonexclusive fishery within the same season.[19] The regulation effectively discriminated between otherwise similarly situated commercial herring fishers in the same administrative area based on the size of the herring operation, with "superexclusive" areas favoring smaller operators.[20] One of the board's goals in passing this regulation was "to alleviate local economic distress." [21] We concluded that the board acted within its authority in passing this regulation.[22] Additionally, we held it to be constitutional.[23] *Hebert*, consequently, stands for two propositions relevant to this case. First, the board may make resource allocations within a single fishery (same administrative area, same fishery resource, and same gear). Second, the board may make such an allocation to assist economically marginal fishers. Today's Opinion conflicts with both of these propositions.[24]

Finally, allocations within a single fishery are already authorized under other provisions governing the board. As the superior court pointed out below, the board could have elected, for example, to simply impose an equal-share quota system for each seiner in Chignik, and such an allocation would have been within the board's authority.[25] It is incongruous to hold that the "among" language precludes allocations "within" a fishery, where other provisions, such as the power to set quotas, already allows it.

For all of these reasons, I would hold that the board acted within its authority in adopting the regulation.

## II. As the Limited Entry Act Is Not the Controlling Statute for the Board of Fisheries, the Proper Test Is Whether the Regulation Directly Conflicts with the Act; Because It Does Not, the Regulation Is Valid.

The Opinion, incorrectly assuming that the Limited Entry Act is the controlling statute for the Board of Fisheries, concludes that the regulation is inconsistent with the purposes and provisions of the Limited Entry Act. But because the Limited Entry Act is not the controlling statute, the proper question is whether the regulation directly conflicts with it. Because it does not directly conflict with

16. *Peninsula Mktg. Ass'n v. State*, 817 P.2d 917, 920–22 (Alaska 1991).

17. 803 P.2d 863, 865 (Alaska 1990).

18. *State v. Hebert*, 743 P.2d 392 (Alaska App. 1987).

19. 803 P.2d at 864.

20. *Id.* at 865, 869. Because the regulation prohibited a person from fishing in both a superexclusive and a nonexclusive fishery, the board reasoned that there would be insufficient incentive for larger fishing boats to operate within the superexclusive areas while smaller boats would be able to thrive in the superexclusive areas absent competition from larger boats. *Id.* at 869.

21. *Id.* at 865.

22. *See id.*

23. *Id.* at 865–67.

24. There is an additional factual similarity between the co-op regulation and the regulation in *Hebert*. The co-op regulation expressly prohibits any co-op member from participating in any salmon fishery outside of Area L from June 1 to August 31 of each year. 5 AAC 15.359(b)(6). This restriction resembles the operation of the *Hebert* "superexclusive" fisheries—while those who benefit from the regulation are treated favorably within a certain area, they are also restricted from fishing in all other areas. The fishers who decline membership in the co-op, in contrast, remain free to use permits to simultaneously conduct fishing operations in other areas.

25. In support of this proposition, the court cited 5 AAC 28.170(f) (imposing individual annual equal-share amount limit for commercial sablefish in subdistricts of Eastern Gulf of Alaska). The board is explicitly authorized to impose quotas, among other things, by AS 16.05.251(a)(3).

the Limited Entry Act, I would not invalidate the regulation.

The Opinion begins with the observation that a "regulation may be invalid if it is fundamentally inconsistent with the legislative intent underlying its controlling statute."[26] I agree with this legal proposition. But I disagree with the draft's unspoken assumption that the Limited Entry Act is the controlling statute. The regulation at issue was adopted by the Board of Fisheries, whose controlling statute is AS *16.05*. The Limited Entry Act, which established the Alaska Commercial Fisheries Entry Commission (CFEC), is found in AS *16.43*. Because the Limited Entry Act is not the board's controlling statute, the Opinion misstates the required showing. In order to strike down a regulation based on a *non*-controlling statute, as is the case here, a court must find the regulation to be in "direct conflict" with that statute.[27]

Moreover, this onerous burden is heightened by the specific statutory schemes in this case. As noted above, AS 16.05 grants the Board of Fisheries broad and extensive powers, which we have interpreted expansively.[28] The legislature took pains to provide in the Limited Entry Act, AS 16.43.950, that *"[n]othing in this chapter limits the power of the Board of Fisheries."* (Emphasis added.) This language suggests that a regulation of the board could never be invalidated on grounds of conflict with the Limited Entry Act; or, if it could, that the conflict would need to be severe—for example, a regulation

by the board that usurped the CFEC's express authority by setting the terms or fees for interim-use or entry permits. Grunert cannot make such a showing of direct conflict in this case.

The Opinion incorrectly suggests that a conflict exists between the regulation and the purposes of the Limited Entry Act. Not only is the co-op regulation consistent with the Act, the regulation actually furthers two of its three purposes.[29] One of the purposes— economic health and stability of the commercial fishery—is strongly enhanced by the regulation.[30] A second purpose—conservation— is enhanced to a lesser degree.[31] A third purpose—sustained yield—is not affected. It therefore cannot be said that the co-op regulation conflicts with *any* of the purposes behind the Limited Entry Act.

The approach of the Opinion is to take the Limited Entry Act's qualifying factors for the CFEC's permitting process and to transform them into restrictions on the Board of Fisheries. This approach is problematic because, as indicated above, the Act explicitly states that its provisions shall *not* limit the powers of the board.[32] Moreover, the Opinion fails to identify any actual conflict with the CFEC's qualifying factors. The co-op regulation simply does not intrude upon the CFEC's regulatory authority. The regulation neither grants permits nor alters permitting rules. It does not change the requirement that all fishers—and all members of any co-op—properly obtain CFEC permits. Indeed, the record reflects that each member

---

**26.** Citing *Madison v. Alaska Dep't of Fish & Game,* 696 P.2d 168, 178 (Alaska 1985) (setting forth required showing under controlling statute).

**27.** *State v. Anderson,* 749 P.2d 1342, 1344 (Alaska 1988).

**28.** *See* AS 16.05.251(a); *Kenai Peninsula Fisherman's Coop. Ass'n v. State,* 628 P.2d 897, 903 (Alaska 1981). Our broad interpretation includes, as discussed above, our holding in *State v. Hebert,* 803 P.2d 863, 865 (Alaska 1990), which upheld a regulation very similar in effect to the regulation at issue here.

**29.** "It is the purpose of this chapter to promote the conservation and the sustained yield management of Alaska's fishery resource and the eco-

nomic health and stability of commercial fishing in Alaska by regulating and controlling entry of participants and vessels into the commercial fisheries in the public interest and without unjust discrimination." AS 16.43.010(a).

**30.** For example, a study conducted by the McDowell Group during the administrative process concluded that a cooperative fishery would (1) reduce the costs of sockeye salmon harvest by eighty percent, (2) increase the average net income per permit holder by an average of one-hundred forty percent, (3) increase the overall quality to the harvest, and (4) enhance the market value for Chignik sockeye.

**31.** *See supra* note 10.

**32.** AS 16.43.950.

of the co-op, before joining the co-op, had successfully passed through the CFEC's qualification process. Similarly, nothing in the Limited Entry Act prohibits cooperative or joint venture fishing efforts. To the extent that the co-op structure will incidentally affect the marketplace or business of the Chignik fishery at some unknown point in the future, the CFEC remains free to increase or decrease the "optimum" number of permits in that fishery.[33] Any hypothetical, incidental economic effect cannot seriously be considered a "direct conflict" with the CFEC's jurisdiction.[34]

The Opinion relies heavily on the argument that the cooperative approach is different from what it sees as the former competitive model. It implies that only the competitive model is authorized by the Limited Entry Act. But that is plainly not the case. The Limited Entry Act was drafted to make certain that those admitted into the system actually were individuals economically dependent upon the fishery, who had fished in the past, and who had the ability to fish. All of these requirements having been met, the CFEC issued permits. There is no suggestion, in either the Limited Entry Act or the Fish and Game Code, that the Limited Entry Act's standards, used to determine entry into limited fisheries, constrain the power of the board in meeting developing crises in Alaska's fisheries.

Finally, other policy concerns raised in the Opinion seem improper and overly static. It uses the regulation's economic efficiency as an argument against it—for example, in complaining that even though the cooperative will obtain a higher quality product for a fraction of the cost and labor, some members of the cooperative will profit from the arrangement while "holding down an office job or sitting at home." The Opinion prefers a wasteful state of affairs in which only a few fishers do better than break even and the cost of producing an inferior product is unnecessarily high. Similarly, its concern with the free-rider problem (in stating that the cooperative "actually discourages active participation") is a red herring. Participation within the cooperative simply becomes a matter of contractual agreement. As the cooperative's bylaws indicate, each member shares in leftover proceeds, but those who contract with the cooperative to actually fish will be compensated for that extra labor. In contrast to a free-rider problem, the individual members of the cooperative will mutually determine how their resources can be used most effectively.

The Opinion also contends that the cooperative members "may suffer greater economic distress as a result of the cooperative fishery," putting forth a hypothetical scenario to that effect. Not only is such a consideration inapposite to the question of whether the regulation is in direct conflict with the Limited Entry Act, it is also improper given our standard of review. Where highly specialized agency expertise is involved, we will not substitute our own judgment for the board's.[35] Our role is to ensure only that the agency has taken a "hard look at the salient problems and has genuinely engaged in reasoned decision making."[36] If the board concluded after full administrative procedures that the co-op regulations would improve the economics of the Chignik fishery—as it did here—we should not second-guess that conclusion and hypothesize the opposite result.

---

33. *See* AS 16.43.300. This power of the CFEC erases the Opinion's concern that the regulation interferes with permitting requirements such as the applicant being "presently able to engage actively in the fishery." AS 16.43.330(a). Despite the regulation, the CFEC remains free to issue permits to only those people who best meet their qualifications. (All members of the cooperative here have met these qualifications.) In addition, the Opinion's suggestion that the cumulative effect of the permitting requirements *requires* each permit holder to *actually fish* is without statutory support and defies common sense.

34. It is also worth noting that, although Grunert complains that the CFEC's jurisdiction is being intruded upon, we have heard no complaint from the CFEC itself regarding the regulation.

35. *Lakosh v. Alaska Dep't of Envtl. Conservation,* 49 P.3d 1111, 1114 (Alaska 2002); *Meier v. State, Bd. of Fisheries,* 739 P.2d 172, 174 (Alaska 1987); *Kingery v. Chapple,* 504 P.2d 831, 835 (Alaska 1972) ("[T]he 'wisdom' of a regulation is not a subject of review.").

36. *Interior Alaska Airboat Ass'n v. State, Bd. of Game,* 18 P.3d 686, 690 (Alaska 2001).

The regulation also sought to protect the interests of the competitive fishers to the extent practicable. In instances where the membership of the co-op is less than eighty-five percent of the permitted fishers, the allocation to the co-op is 0.9% of the sockeye harvest per permit holder within the co-op.[37] The facts of this case presented such an instance. As a result, the co-op fishers, though they represented seventy-seven percent of the permitted fishers, were allocated only sixty-nine percent of the fish. In contrast, the competitive fishers (twenty-three percent of the total fishers) were allocated thirty-one percent of the fish—a higher average allocation per individual.

For all these reasons, I respectfully dissent. I would find the regulation valid as within the board's authority under its controlling statute and not in direct conflict with the Limited Entry Act.